UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY CECIL,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>JEFF BEARD, et al.,<br><br>　　　　Defendants. | No. 2:13-cv-1923 TLN KJN P<br><br><br>FINDINGS & RECOMMENDATIONS |

I. Introduction

　　　Plaintiff is a state prisoner housed at R. J. Donovan Correctional Facility ("RJD"), proceeding without counsel. On October 22, 2014, plaintiff filed a motion for temporary restraining order seeking an order requiring the provision of pain medication and pain management forthwith. On October 24, 2014, defendants were directed to respond to plaintiff's motion for temporary restraining order. On October 31, 2014, counsel for defendants filed an opposition to plaintiff's motion, including a declaration from Dr. Casian, one of plaintiff's treating physicians at RJD, as well as copies of plaintiff's medical records. (ECF No. 88.) After receiving an extension of time, plaintiff filed a reply.

　　　As set forth below, the undersigned recommends that plaintiff's motion for temporary restraining order be denied.

////

II. <u>The Parties' Arguments</u>

In his motion, plaintiff claims that he is in excruciating pain from the hernia and the aortic aneurysm (ECF No. 86 at 3), and that the 600 mg. of Ibuprofen no longer controls such pain. Plaintiff states that the October 3, 2014 c-scan revealed a "serious anomaly" with the stented aneurysm that will most likely require immediate surgery. (ECF No. 86 at 3.) Despite his alleged constant pain complaints, plaintiff avers that his primary care physician Dr. Casian refused plaintiff's request for additional pain relief, stating that the doctor was going to allow the hernia specialist to deal with plaintiff's hernia pain prior to surgery, and the primary care physician would address plaintiff's post-surgical pain issues, if any. (ECF No. 86 at 1.) However, the hernia specialist referral is still pending approval, so it is unclear at this time when plaintiff might be examined by the specialist. Plaintiff provided a copy of his October 1, 2014 health care services request form in which he states that he is "still having excruciating hernia pain." (ECF No. 86 at 5.) Plaintiff reminds the court that his initial request for hernia repair was made on February 8, 2011.

In opposition, defendants provide evidence that there is no anatomical or physiological basis for the iliac aneurysm to cause plaintiff unremitting pain. (ECF No. 88 at 10.) Dr. Casian declares that plaintiff's medical records do not show that plaintiff suffers "substantial pain or limitations from his hernias." (ECF No. 88 at 11, 12.) Dr. Casian addressed plaintiff's concern regarding pain medications as follows:

> 11. Mr. Cecil currently has been prescribed 600 mg. Ibuprofen, taking one tablet, twice a day, for pain, along with aspirin. A higher dose of Ibuprofen cause gastritis, ulcers, kidney failure, liver failure, fluid retention, gastrointestinal bleeding and death. I do not believe that a higher dose of Ibuprofen can be safely prescribed.
>
> 12. Narcotic pain medication is disfavored by pain management experts for pain not resulting from cancer, and it is my understanding that the California Medical Board is initiating medical license revocation proceedings against physicians who unnecessarily prescribe narcotic pain medication, and has issued a "one pill can kill" warning as part of a campaign to reduce the prescription of narcotic pain medication. The use of narcotics can cause respiratory depression, fluid retention, severe constipation, itching, sedation and loss of balance, addiction and death. In my experience, inmates have a high addiction rate. Inmates who are prescribed narcotics face pressure from addicts in the prison to

2

          share or sell their drugs. There are deaths each year in the prison associated with overdose or drug dealing.

(ECF No. 88 at 12.)

      Dr. Casian states that plaintiff suffers from myriad health issues: history of coronary artery disease; ischemic cardiomyopathy; peripheral vascular disease, with stenting of an iliac arterial aneurysm; cataract; macular degeneration; umbilical hernia; and left inguinal hernia. During prior physical examinations, plaintiff complained of "continued lower extremity pain;" however, Dr. Casian noted that plaintiff has been "independent in all activities of daily living, and ambulates using a cane or walker." (ECF No. 88 at 10.) Dr. Casian did not record "any complaints about [plaintiff's] abdomen or hernia." (Id.)

      On October 3, 2014, a follow-up CT angiogram was performed, which showed a "thrombosed (clotted) 3.4 cm aneurysm." (ECF No. 88 at 10, 15.) The medical plan for this aneurysm is for plaintiff to continue aspirin, and to follow up with the vascular surgeon, which Dr. Casian anticipated would take place within the next three weeks. (ECF No. 88 at 10.) Plaintiff is followed by cardiology for chest pain, and takes five or six drugs to treat his cardiovascular disease. (ECF No. 88 at 11.) Plaintiff is being followed by vascular surgery specialists for his abnormal circulation. Dr. Casian avers that plaintiff's circulation is adequate and does not impair his daily activities, and that hernia surgery or surgery to improve his circulation is risky. (ECF No. 88 at 10.) Indeed, as a "high risk" patient, plaintiff "could die on the operating table." (ECF No. 88 at 12.)

      In reply, plaintiff claims that from February 8, 2011, to October 24, 2014, "nothing had been done to seek hernia surgery for plaintiff." (ECF No. 94 at 1.) Plaintiff contends that since the October 24, 2014 order, plaintiff received a hernia Tele Med consultation, and then a hands-on examination by a vascular surgeon on October 31, 2014, around 10:00 a.m., at Alvarado Hospital Medical Center ("Alvarado"). Plaintiff claims that he explained to the surgeon that, after reviewing plaintiff's October 3, 2014 C-Scan, plaintiff's primary care physician, Dr. G. Casian, told plaintiff that an anomaly was found around plaintiff's stent in his aneurysm, and it was "crusting" and could crack and start to bleed. (ECF No. 94 at 2.) Plaintiff claims the

vascular surgeon became concerned and again reviewed plaintiff's C-Scan, but said he could not find anything "crusting," and that the stent and aneurysm were stable, there is good blood pressure in both legs and ankles with good coloring in the feet, "[and] any and all pain is related to the hernias, not the aneurysm. (ECF No. 94 at 3.)

Plaintiff argues that "defendants have attempted to use smoke and mirrors by claiming any such prior delays were due to plaintiff's cardiology issues," because Dr. Casian states that "plaintiff has not been in satisfactory cardiovascular health to undergo non-emergency surgery on his hernias during the past year." (ECF No. 94 at 3.) Plaintiff contends he has been "cardiac cleared" since January 2014 from Renown Medical in Reno, Nevada. Plaintiff argues that Dr. Casian "has gone to great lengths to attempt to cover her deliberate indifference towards not prescribing pain medication for hernia pain." (ECF No. 94 at 4.)

Plaintiff claims he asked for pain medication during the TeleMed consultation, but Dr. King, the surgeon for hernia repair, said it was up to Dr. Casian. (Id.) As for Dr. Casian discussing plaintiff's pain needs with the Chief Medical Officer, plaintiff asks when this will occur. In response to Dr. Casian's claim that plaintiff has not complained of hernia pain, plaintiff states that in Dr. Casian's progress notes "[t]he patient continues to complain of lower extremity pain and swelling, especially with prolonged walking and standing." (Id., citing ECF No. 88 at 15.) Plaintiff now describes his pain as a "[h]ot blow torch going down the side of plaintiff's left testicle and then down his leg." (ECF No. 94 at 7.)

Plaintiff argues that Dr. Casian has attempted to fabricate false allegations, blaming cardiovascular issues for the delay in hernia surgery and the delay in prescribing pain medication for plaintiff's hernia. Plaintiff denies he has sought narcotics for his pain, but simply wishes to increase his Ibuprofen prescription from 600 mg to 800 mg. (ECF No. 94 at 8.) Plaintiff contends that when his hernias are examined, "and they start poking and prodding," he complains that they are "sore and hurt," but that medical professionals simply write "non-tender" in their progress notes. (ECF No. 94 at 8.) Plaintiff denies his request for injunctive relief alleged pain from the aneurysm, and claims the request "all along presented to this court about hernias and hernia pain, only." (ECF No. 94 at 9.)

4

1    Plaintiff also disputes Dr. Casian's claim that plaintiff takes 5 or 6 medications for
2  cardiovascular disease, claiming that he takes Metoprolol and Amlodipine Besylate, which are
3  heart medications, and Crestor and Aspirin for cholesterol and blood-thinning.  (ECF No. 94 at 6.)
4    On November 8, 2014, plaintiff was prescribed Ibuprofen, 600 mg. by Dr. M.
5  Garikaparthi.  (ECF No. 94 at 11.)
6    In support of plaintiff's reply, he provided the following exhibits:
7    An October 3, 2014 report from imaging services,[1] noting plaintiff has a hiatal hernia, and
8  umbilical and inguinal hernias in his abdominal wall.  (ECF No. 94 at 13.)  The imaging report
9  notes the following impression:  "Left iliac arterial stent covering the hypogastric artery origin a
10 thrombosed[2] 3.4 cm aneurysm at the common iliac artery bifurcation.  No significant stenosis."[3]
11 (ECF No. 94 at 14.)
12   Progress notes from M. Balcos, R.N., dated October 4, 2014, at 1410, "offsite return from
13 Alvarado following CT for plaintiff's iliac aneurysm.  (ECF No. 94 at 15.)  In the comments
14 portion, R.N. Balcos wrote:  "Alert and oriented, ambulatory with a cane, . . . stated that all he
15 had done is CT without surgery.  Denies pain or discomfort.  Advised he will be scheduled with
16 primary care physician follow up in 14 days.  Achieved effective communication. . . ."  (ECF No.
17 94 at 15.)
18   Progress report from Dr. Francis P. Kelley, Renown Institute for Heart and Vascular
19 Health, Reno, Nevada, dated January 27, 2014, noting the following impression:
20       1.  Coronary artery disease.  Patient is clinically stable.
21       2.  Chronic atypical chest discomfort.  This has not changed in
             nature.
22
////
23

---

[1] The imaging report for the CT scan notes that Dr. Richard Butcher referred plaintiff for the imaging service.  (ECF No. 94 at 13.)  The court was not provided a copy of a report by Dr. Butcher or the vascular surgeon's report from plaintiff's October 31, 2014 examination.

[2] "Thrombosed" is defined as "clotting within a blood vessel that may cause infarction of tissues supplied by the vessel."  Stedman's Medical Dictionary 1985 (28th ed. 2006).

[3] "Stenosis" is defined as "[a] stricture of any canal or orifice" or narrowing.  Stedman's Medical Dictionary 1832 (28th ed. 2006).

>     3. Hyperlipidemia. Would like to see the patients LDL less than 70. He would either require changing to Crestor or starting him on Zetia.

(ECF No. 94 at 16.)

Medical Progress Note, dated July 14, 2014, from Dr. Sarah Ghayouri, reflects that plaintiff presented "complaining of left inguinal area discomfort and swelling on and off for a few months' duration. The symptom and swelling was worse on standing and improved with lying down." (ECF No. 94 at 18.) Dr. Ghayouri noted the following Assessment/Plan:

>     1. Reducible left inguinal hernia. The patient was assured and elective surgical treatment was discussed.
>
>     2. Coronary artery disease, stable. Continue current medication hypertension and hypercholesterolemia, statin, aspirin, nitroglycerin, and beta blocker.
>
>     3. Benign prostatic hypertrophy, stable.
>
>     4. Umbilical hernia, stable.
>
>     5. Past history of iliac aneurysm, status post stenting, stable. The patient was referred to see a vascular surgeon due to recent complaint of left groin swelling. Vascular surgeon had requested a CT aortogram, abdominal and lower extremities bilaterally with run-off and contrast prior to the visit. After examination of the patient, most of the patient's complaint was in regard to this small reducible left inguinal hernia. I do not see any indication at this time for a CT aortogram of abdominal and lower extremities. Since the patient does not have any vascular complaints, peripheral pulses are bilaterally normal. Patient denies any type of calf pain or claudication.[4] This was deferred at the present time.

(ECF No. 94 at 19.) Plaintiff was to be scheduled for follow-up by his primary care physician in thirty days. (Id.) Plaintiff's current medications were listed, including prescriptions for plaintiff's cardiovascular care, including Nitroglycerin p.r.n., and Ibuprofen. (ECF No. 94 at 18.)

III. Legal Standards

Plaintiff seeks a temporary restraining order. A temporary restraining order is an extraordinary and temporary "fix" that the court may issue without notice to the adverse party if, in an affidavit or verified complaint, the movant "clearly show[s] that immediate and irreparable

---

[4] Claudication is a condition caused by ischemia of the muscles; characterized by attacks of lameness and pain, brought on by walking, chiefly in the calf muscles." Stedman's Medical Dictionary 389 (28th ed. 2006).

6

1 injury, loss, or damage will result to the movant before the adverse party can be heard in
2 opposition." Fed. R. Civ. P. 65(b)(1)(A). The purpose of a temporary restraining order is to
3 preserve the status quo pending a fuller hearing. See Fed. R. Civ. P. 65. It is the practice of this
4 district to construe a motion for temporary restraining order as a motion for preliminary
5 injunction. Local Rule 231(a); see also Aiello v. OneWest Bank, 2010 WL 406092 at *1 (E.D.
6 Cal. Jan. 29, 2010) ("Temporary restraining orders are governed by the same standard applicable
7 to preliminary injunctions.") (internal quotation and citations omitted).

        The party requesting preliminary injunctive relief must show that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, 555 U.S. 7, 20 (2008). The propriety of a request for injunctive relief hinges on a significant threat of irreparable injury that must be imminent in nature. Caribbean Marine Serv. Co. v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988).

        Alternatively, under the so-called sliding scale approach, as long as the plaintiff demonstrates the requisite likelihood of irreparable harm and can show that an injunction is in the public interest, a preliminary injunction may issue so long as serious questions going to the merits of the case are raised and the balance of hardships tips sharply in plaintiff's favor. Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127, 1131-36 (9th Cir. 2011) (concluding that the "serious questions" version of the sliding scale test for preliminary injunctions remains viable after Winter).

        The principal purpose of preliminary injunctive relief is to preserve the court's power to render a meaningful decision after a trial on the merits. See 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2947 (3d ed. 2014). Implicit in this required showing is that the relief awarded is only temporary and there will be a full hearing on the merits of the claims raised in the injunction when the action is brought to trial.

        In cases brought by prisoners involving conditions of confinement, any preliminary injunction "must be narrowly drawn, extend no further than necessary to correct the harm the

////

court finds requires preliminary relief, and be the least intrusive means necessary to correct the harm." 18 U.S.C. § 3626(a)(2).

IV. Discussion

First, the undersigned addresses plaintiff's unrelated and abandoned claims. In his operative complaint, plaintiff did not allege inappropriate treatment for his myriad other medical conditions, and did not allege that he was experiencing pain from his aneurysm located near the hernia. Plaintiff now claims that he did not include a claim concerning aneurysm pain in the instant motion for injunctive relief. However, in his request, plaintiff stated that "[f]rom the aneurysm and hernias plaintiff has been living with excruciating pain," and claimed he would "most likely" require "immediate surgery for his stented aneurysm." (ECF No. 86 at 3.) Plaintiff has now abandoned that position (ECF No. 94 at 9); thus, no ruling on plaintiff's request in connection with his stented aneurysm is required.

In his request and reply, plaintiff raises claims of deliberate indifference to his serious medical needs in connection with Dr. Casian's alleged misreading of plaintiff's CT scan of his stented aneurysm, and alleges that he was prescribed the wrong type of walker that medical has been removing because it allegedly is not appropriate for the prison yard terrain. Such allegations are not included in the underlying complaint, and the claim concerning the walker was not included in plaintiff's request for injunctive relief. Thus, there would not be a full hearing on the merits of such allegations when this action goes to trial. Therefore, plaintiff's motion for a temporary restraining order based on medical care for his stented aneurysm or claims concerning the prescribed walker are denied without prejudice. If plaintiff has concerns about unrelated medical treatment at RJD, he must pursue such claims through the medical grievance process at RJD, not through this action.

Second, in his motion for injunctive relief, plaintiff contends that Dr. Casian

> continues to deny plaintiff's appropriate pain medication while he awaits inguinal and abdominal hernia surgeries. As of October 6, 2014, Dr. Casian flatly refused plaintiff's direct request for a higher dosage of Ibuprofen, since the 600 mg dosage isn't doing anything.

////

Case 2:13-cv-01923-TLN-KJN   Document 97   Filed 12/16/14   Page 9 of 14

(ECF No. 86 at 1.) Plaintiff seeks an order for "pain medication and management" by medical at RJD. (Id. at 4.) Dr. Casian is not a named defendant in this action.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment. " Estelle v. Gamble, 429 U.S. 97, 104-05 (1976) (internal citations, punctuation and quotation marks omitted). Plaintiff must show "deliberate indifference" to his "serious medical needs," id. at 104, which includes "both an objective standard -- that the deprivation was serious enough to constitute cruel and unusual punishment -- and a subjective standard -- deliberate indifference." Snow v. McDaniel, 681 F.3d 978, 982 (9th Cir. 2012), overruled in part on other grounds by Peralta v. Dillard, 744 F.3d 1076 (9th Cir. 2014) (en banc).

To meet the objective element, plaintiff must demonstrate the existence of a serious medical need. Estelle, 429 U.S. at 104. Such need exists if the failure to treat the injury or condition "could result in further significant injury" or cause "the unnecessary and wanton infliction of pain." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotes and citations omitted). Serious medical needs include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; [and] the existence of chronic and substantial pain." McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled in part on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997).

Under the subjective element, a prison official is deliberately indifferent only if the official "knows of and disregards an excessive risk to inmate health and safety." Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) (internal quotes and citation omitted). To prevail on a claim for deliberate indifference, a prisoner must demonstrate that the prison official "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994).

In applying this standard, the Ninth Circuit has held that before it can be said that a prisoner's civil rights have been abridged, "the indifference to his medical needs must be

9

substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105-06.) A complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Even gross negligence is insufficient to establish deliberate indifference to serious medical needs. See Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990). A difference of opinion between medical professionals concerning the appropriate course of treatment generally does not amount to deliberate indifference to serious medical needs. Toguchi, 391 F.3d at 1058; Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989). Also, "a difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a [§] 1983 claim." Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981). To establish that such a difference of opinion amounted to deliberate indifference, the prisoner "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and "that they chose this course in conscious disregard of an excessive risk to [the prisoner's] health." See Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); see also Wilhelm v. Rotman, 680 F.3d 1113, 1123 (9th Cir. 2012) (doctor's awareness of need for treatment followed by his unnecessary delay in implementing the prescribed treatment sufficient to plead deliberate indifference); see also Snow, 681 F.3d at 988 (decision of non-treating, non-specialist physicians to repeatedly deny recommended surgical treatment may be medically unacceptable under all the circumstances.)

In April of 2014, plaintiff was transferred to RJD, which is located in San Diego, a major metropolitan city that is closer to hospitals and specialists than when plaintiff was housed at HDSP in Susanville. Plaintiff argues that defendants are using "smoke and mirrors" to obfuscate the current issue by raising plaintiff's stented aneurysm and other medical ailments. However, in his verified amended complaint, plaintiff stated that on January 10, 2012, plaintiff was diagnosed as a "high risk medical inmate," . . . "under chronic care for acute heart disease, with total occlusion of right coronary artery, with aneurysm of left common iliac artery." (ECF No. 32 at 2.) Plaintiff earlier provided a copy of the January 10, 2012 medical classification chrono which stated that plaintiff is at high medical risk, has a history of hypertension, coronary artery disease

</pre>

with history of myocardial infarction or heart attack, total occlusion of his right coronary artery, and a history of left iliac artery aneurysm. (ECF No. 10 at 25.) Indeed, Dr. Syverson, a local surgeon in Susanville, was reluctant to perform plaintiff's hernia repair surgery in Susanville because there were inadequate resources in the area to address cardiac complications that may arise during the surgery. (ECF No. 24 at 8.) Plaintiff is 67 years old, and in addition to multiple medications for his cardiovascular issues, plaintiff's current medications include Nitroglycerin p.r.n. (ECF No. 94 at 18.) Dr. Casian explains that "being 'high risk' means [plaintiff] could die on the operating room table." (ECF No. 88 at 12.) In light of plaintiff's medical history, and the medical records submitted for evaluation by the court throughout this action, as well as plaintiff's own filings, it is disingenuous of plaintiff to challenge conservative medical treatment. While the undersigned is sympathetic to plaintiff's frustration with the delay in receiving hernia repair surgery, or in receiving what plaintiff views is an inappropriate level of pain relief from Dr. Casian, plaintiff adduced no medical evidence suggesting that Dr. Casian's cautious approach constitutes deliberate indifference to plaintiff's serious medical needs.

Moreover, Dr. Casian provided evidence that plaintiff is receiving appropriate medical care at RJD, which includes a prescription for Ibuprofen, and that Dr. Casian was in the process of determining whether different pain medications can be administered safely, including discussions with plaintiff's surgery consultant. (ECF No. 88 at 12-13.) Plaintiff confirms he was prescribed Ibuprofen on November 8, 2014. Moreover, plaintiff received a CT scan of his stented aneurysm, was seen and examined by a vascular surgeon, and appears to be seen regularly by physicians at RJD.

In the instant request for injunctive relief, plaintiff declares that he has been complaining of excruciating pain "for literally years," yet plaintiff provided only one health care services request form, dated October 1, 2014, in which he requested health care because he was "still having excruciating hernia pain." (ECF No. 86 at 2, 5.) But plaintiff provided no document explaining what treatment he received for the October 1, 2014 request. Plaintiff now describes his pain as a "[h]ot blow torch going down the side of plaintiff's left testicle and then down his leg." (ECF No. 94 at 7.) But plaintiff does not identify whether this type of pain is constant or

11

intermittent, and he provides no medical records demonstrating that he presented with such complaints or medical records addressing such complaints.

By contrast, in his reply, plaintiff states that his hernias are "sore and hurt" during examination by medical professionals. (ECF No. 94 at 8.) In the operative complaint, plaintiff does not allege he was suffering from excruciating pain, but states that in 2012, medical staff "ignored plaintiff's hernia problem since it was not protruding out very much or causing extreme pain at that moment." (ECF No. 32 at 4.) In 2013 he presented with "constant hernia pain," and on March 18, 2013, Dr. Syverson agreed that hernia repair surgery was needed. (Id.) When he presented to Dr. Ghayouri on July 14, 2014, plaintiff "was complaining of left inguinal area discomfort and swelling on and off for a few months' duration. The symptom and swelling was worse on standing and improved with lying down." (ECF No. 94 at 18.) Dr. Ghayouri noted that "most of the patient's complaint was in regard to this small reducible left inguinal hernia." (ECF No. 94 at 19.) Plaintiff denied "any type of calf pain or claudication." (ECF No. 94 at 19.) Dr. Casian noted that plaintiff "continues to complain of lower extremity pain and swelling especially with prolonged walking and standing." (ECF No. 88 at 15.) Such medical records do not suggest that plaintiff's hernia pain is excruciating, either consistently or intermittently, and do not demonstrate that plaintiff's inguinal hernia is worsening to the extent it requires immediate intervention, either by medical professionals or by this court. Plaintiff provided no evidence that the hernia has gotten worse, protrudes more, or has grown larger. Indeed, in Dr. Ghayouri's recent progress note, the hernia was described as "small" and "elective surgical treatment was discussed." (ECF No. 94 at 19.) Moreover, plaintiff claims that the vascular surgeon attributed "any and all pain" as "related to the hernias, not the aneurysm," but plaintiff did not provide a copy of the vascular surgeon's report. (ECF No. 94 at 3.) Finally, plaintiff provided no medical evidence demonstrating that the lower extremity pain described by Dr. Casian is caused by plaintiff's hernia rather than by his peripheral artery disease or issues related to his poor circulation.

According to Estelle, inadequate medical care does not constitute cruel and unusual punishment cognizable under § 1983 unless the mistreatment rose to the level of "deliberate

indifference to serious medical needs." 429 U.S. at 106. While not giving an inmate pain medication could conceivably rise to such a level of mistreatment, it would be incorrect to expand the limited holding of Estelle so that every claim of ineffective treatment of pain becomes a violation of the Eighth Amendment. See id. at 107-08 (establishing the claim of deliberate indifference to serious medical needs, but dismissing the defendant doctors from the lawsuit on the grounds that their ineffective treatment of the plaintiff's pain, even if malpractice, did not rise to the level of deliberate indifference).

According to McGuckin, the unnecessary continuation of pain may constitute the harm necessary to establish that an Eighth Amendment violation resulted from a delay in providing medical care. 974 F.2d at 1062. But continuous pain alone does not satisfy all the elements of deliberate indifference. See Jett, 439 F.3d at 1096 (harm caused by indifference is only one of two elements under the second prong of the Ninth Circuit's deliberate indifference test). In order to satisfy the second prong, plaintiff must still show "a purposeful act or failure to respond to a prisoner's pain or possible medical need." Id. Moreover, as set forth above, "a difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a [§] 1983 claim." Franklin, 662 F.2d at 1344. Plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and "that they chose this course in conscious disregard of an excessive risk to [plaintiff's] health." See McIntosh, 90 F.3d at 332; see also Wilhelm, 680 F.3d at 1123.

While the undersigned is certain that plaintiff's inguinal hernia is painful, plaintiff has failed to demonstrate that the course of treatment for plaintiff's pain as prescribed at RJD is medically unacceptable under the circumstances. Rather, plaintiff's motion reflects a difference of opinion as to the administration of pain medication. Plaintiff concedes that he does not seek narcotics for pain relief, but rather wishes to increase his Ibuprofen prescription from 600 mg to 800 mg. Defendants adduced evidence that increasing plaintiff's dose of Ibuprofen can cause gastritis, ulcers, and other serious medical ailments. (ECF No. 88 at 12.) Plaintiff adduced no medical evidence to the contrary.

////

Thus, plaintiff has failed to demonstrate that prison officials at RJD are inappropriately treating plaintiff's pain. Rather, the evidence shows that plaintiff, 67 years old, is being conservatively and cautiously treated based on his status as a "high risk" patient suffering from very serious heart conditions and peripheral vascular disease. Given the unrebutted medical evidence provided by defendants, plaintiff fails to demonstrate that the balance of hardships tips sharply in plaintiff's favor, or that he faces the likelihood of irreparable harm at this time.[5]

Thus, for all of the above reasons, plaintiff's motion for temporary restraining order should be denied.

V. Conclusion

IT IS HEREBY RECOMMENDED that plaintiff's motion for temporary restraining order (ECF No. 88) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  December 16, 2014

/ceci1923.tro2

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

---

[5] That is not to say that plaintiff's hernia may not get worse, increasing plaintiff's pain and requiring hernia repair surgery based on pain complaints. See Capri v. Cox, 2014 WL 5529355, *2 (D. Nev. Oct. 31, 2014) (prisoner suffering from "stage three hernia" which caused severe pain and prevented him from standing upright, sitting down for prolonged periods, or engaging in a normal exercise regimen, was recommended for hernia surgery, due to prisoner's complaints of pain, pending cardiac clearance based on his history of heart problems.)