UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GARY CECIL,

            Plaintiff,

    v.

JEFF BEARD, et al.,

            Defendants.

No.  2:13-cv-1923 TLN KJN P

FINDINGS AND RECOMMENDATIONS

I.  Introduction

      Plaintiff is a state prisoner, proceeding without counsel.  Plaintiff raises Eighth Amendment claims against defendants Smith, Norgaard, Foulk, Artis, Lozano, Dr. Rohlfing, and Schmidt.  Defendants' motion for summary judgment is before the court.  As set forth more fully below, the undersigned finds that defendants' motion for summary judgment should be granted.

II.  Plaintiff's Amended Complaint

      In his amended complaint (ECF No. 32), plaintiff alleges the following:  On or about February 8, 2011, Dr. Zepp, Wasco State Prison ("WSP"), examined plaintiff and ordered a surgical consult for plaintiff's hernia.  On November 21, 2011, plaintiff was transferred to High Desert State Prison ("HDSP"), and no surgical consult had been provided.

      On January 10, 2012, plaintiff was diagnosed as a high risk medical inmate, and is under chronic care for acute heart disease, with total occlusion of right coronary artery, with aneurysm

1

1   of left common iliac artery and abdominal hernia.   On January 10, 2012, plaintiff claims that

2   PAC Miranda[1] determined that plaintiff should be medically transferred, claiming HDSP is not

3   appropriate housing should a medical issue arise because plaintiff needs to be closer to a hospital,

4   not two hours away from the nearest hospital.  Plaintiff alleges that PAC Miranda wrote a medical

5   classification chrono requesting a medical transfer of plaintiff as a medical need.  Initially, on

6   January 24, 2012, defendant Norgaard, serving as chair of plaintiff's classification committee,

7   agreed with PAC Miranda's assessment, by claiming HDSP is "not appropriate" housing, and

8   plaintiff should be transferred to accommodate plaintiff's medical needs.  However, on February

9   8, 2012, defendant D.L. Smith, Classification Staff Representative ("CSR"), denied plaintiff's

10   transfer recommendation.  Then, defendant Norgaard, serving as CCII at the second level appeal

11   hearing, denied plaintiff's second level appeal.  Defendant Foulk, then Chief Deputy Warden,

12   approved the denial.  On August 8, 2012, plaintiff's third level appeal was denied by Appeals

13   Examiner defendant Artis, and approved by J. Lozano, Chief of Appeals.

14          While at HDSP, plaintiff complained of constant hernia pain, and Dr. Rohlfing obtained a

15   surgical consult with an outside physician, Dr. Syverson.  Dr. Syverson agreed that surgery was

16   needed, but due to plaintiff's other high risk medical issues, recommended that plaintiff be

17   transferred to a facility more able to handle plaintiff's high risk medical issues.  Plaintiff alleges

18   that Dr. Rohlfing did nothing to facilitate plaintiff's transfer, refusing to write another chrono at

19   plaintiff's subsequent classification hearings because PAC Miranda had written a chrono in 2012.

20          On November 26, 2013, Dr. Rohlfing ordered additional prescriptions for plaintiff's

21   hernia; plaintiff alleges that FNP Schmidt[2] reviewed plaintiff's medical records and discontinued

22   those medications, thus evidencing FNP Schmidt's deliberate indifference to plaintiff's serious

23   medical needs.

24   ////

---

26   [1]  In his pleading, plaintiff refers to Miranda as "Dr. Miranda."  However, the medical records
reflect that R. Miranda is a Certified Physician's Assistant ("PAC").  (ECF No. 119 at 88.)

28   [2]  Plaintiff also refers to Schmidt as "Dr. Schmidt."  But L. Schmidt is a Family Nurse
Practitioner ("FNP").  (ECF No. 107-3 at 1.)

1    Plaintiff alleges that defendants failed to follow the orders of PAC Miranda, Dr. Zepp, and

2    Dr. Syverson, and denied, delayed, and intentionally interfered with prescribed medical treatment

3    for over 26 months and counting.  Plaintiff contends that defendants Smith, Norgaard, Foulk,

4    Artis, and Lozano, all nonmedical professionals, ignored, refused to follow, and interfered with

5    medical orders.  Plaintiff alleges defendant Dr. Rohlfing failed to take steps to ensure plaintiff

6    timely received surgical repair of his hernia, and FNP Schmidt evidenced deliberate indifference

7    by discontinuing medications which Dr. Rohlfing prescribed for plaintiff's hernia, as well as

8    canceling the ultrasound for plaintiff's aneurysm.

9    Plaintiff included a section under the subheading "Declaration," in which he "declares that

10    all the foregoing statements are true and correct to the best of his knowledge."  (ECF No. 32 at 6.)

11    But the pleading is not signed under penalty of perjury.  (Id.)

12    III.  Defendants' Motion for Summary Judgment

13    Defendants move for summary judgment on the grounds that plaintiff failed to exhaust

14    available administrative remedies as to defendants Dr. Rohlfing and FNP Schmidt; and contend

15    that defendants were not deliberately indifferent to plaintiff's serious medical needs, and are

16    entitled to qualified immunity.

17    In his verified opposition, plaintiff contends that the evidence shows that as early as

18    February 8, 2011, he required surgical repair of his abdominal hernia, and each defendants' role

19    in failing to ensure he obtained such hernia repair, or failing to ensure his timely transfer such that

20    he could receive such hernia repair, constitutes deliberate indifference to his serious medical

21    needs.

22    In reply, defendants contend that plaintiff's opposition is based on arguments not

23    supported by admissible evidence, and claims not alleged in the first amended complaint.

24    Defendants claim plaintiff acknowledges that he was endorsed for transfer to Richard J. Donovan

25    Correctional Facility ("RJD") right after Dr. Rohlfing became responsible for plaintiff's care, so

26    Dr. Rohlfing is not liable for deliberate indifference.  Defendants argue that plaintiff fails to

27    provide evidence that FNP Schmidt cancelled an ultrasound or a medication prescription, and

28    plaintiff also failed to exhaust his administrative remedies as to Dr. Rohlfing and FNP Schmidt.

1   Defendants argue that plaintiff fails to demonstrate that he was at "high risk" concerning his

2   hernia condition when defendants Norgaard, Smith, Artis, Foulk, and Lozano determined that

3   plaintiff did not require a transfer to RJD in 2012, or that he sustained any harm concerning his

4   hypertension, cardiac issues, or left iliac artery aneurysm while housed at HDSP.

5          Following the court's further briefing order, defendants filed a response noting that the

6   second page of PAC Miranda's 128-C3 chrono signed January 10, 2012, could not be located in

7   plaintiff's health record.  Thus, defendants supplied an exemplar second page for a 128-C3

8   chrono.  (ECF No. 132 at 7.)[3]  Plaintiff then filed his verified supplemental opposition on the

9   issue of exhaustion of administrative remedies.  (ECF No. 134.)  Plaintiff concedes that defendant

10  Rohlfing's name was only mentioned in appeal log no. HDSP-B-13-01351, and that FNP

11  Schmidt's name was not mentioned in any other appeal concerning plaintiff's high risk medical

12  concerns.  (ECF No. 134 at 1.)  Plaintiff claims he was unaware of the January 28, 2011 revisions

13  to CDCR policies regarding exhaustion, and appears to argue he should be excused from the

14  exhaustion requirement.  Plaintiff adds that when he transferred to RJD, he learned that FNP

15  Schmidt and Dr. Rohlfing allegedly violated provisions of the Department Operations Manual

16  ("DOM").

17         On September 16, 2015, defendants filed a reply to plaintiff's supplemental opposition.

18  (ECF No. 137.)  Defendants contend that the Ninth Circuit established the exhaustion requirement

19  for amended complaints in Rhodes v. Robinson, 621 F.3d 1002, 1006 (9th Cir. 2010), and thus

20  prison staff did not make the administrative remedies unavailable to plaintiff because Rhodes was

21  published prior to plaintiff's most recent incarceration on November 30, 2010.  Moreover,

22  defendants point out that the January 28, 2011 revisions to the exhaustion requirement were made

23  prior to plaintiff's November 21, 2011 transfer to HDSP; thus, there were no new regulations to

24

25  [3]  On September 14, 2015, plaintiff filed an objection to defendants' submission, inexplicably
    claiming that the second page of the form looks nothing like the second page of Schmidt's 128-

26  C3 chrono "already on file with this court."  (ECF No. 135.)  Plaintiff does not refer to where in
    the court record such form might be located, and this is the same form that plaintiff claimed he

27  was unable to personally obtain (ECF Nos. 129, 133) in response to the court's order seeking the
    second page.  Both page one of Schmidt's 128-C3 form and the exemplar page two provided by

28  defendants bear the date 10/09.  Plaintiff's objection is overruled.

1   provide.  Defendants provide the declaration of C. Amrein, litigation coordinator at HDSP, who

2   declares that when an inmate arrives at HDSP, the inmate participates in an orientation program

3   where information concerning administrative remedies and appeal procedures is provided.  (ECF

4   No. 137-2 at 3.)  In addition, Amrein declares that she has "personal knowledge that copies of the

5   current California Code of Regulations title 15 are available at every housing unit, program

6   office, and law library at HDSP."  (ECF No. 137-2 at 3.)  Amrein also notes that an inmate may

7   obtain his own copy of the title 15 upon request.  (Id.)  Finally, defendants argue that plaintiff's

8   new claims concerning the violation of the DOM still have to be exhausted, and such violations

9   would not excuse plaintiff's failure to exhaust the instant claims.  In any event, defendants

10   contend that the violation of prison regulations fails to state a cognizable constitutional violation.

11       On September 28, 2015, plaintiff filed objections to Amrein's recent declaration, stating

12   under penalty of perjury that when he arrived at HDSP late in the evening, no orientation took

13   place, and that "no orientation ever took place at HDSP."  (ECF No. 138 at 1.)  Plaintiff points

14   out that an inmate's signature is required when issued a copy of title 15, and defendants have not

15   provided evidence that plaintiff received such a copy.  (ECF No. 138 at 2.)  Plaintiff appears to

16   imply that no title 15 was available at plaintiff's housing unit at HDSP.[4]  (ECF No. 138 at 2.)

17   IV.  Legal Standard for Summary Judgment

18       Summary judgment is appropriate when it is demonstrated that the standard set forth in

19   Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the

20   movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

21   judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]the moving party always bears the

22   initial responsibility of informing the district court of the basis for its motion, and identifying

23   those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

24   together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue

---

25   [4]  In declaring that Amrein's declaration is false, plaintiff asks, "what housing unit was [Amrein]
26   describing?  Certainly not the plaintiff's housing unit.  The court should inquire by asking the
     Prison Law Office . . . since they tour all housing units, as well as ADA Monitors.  They both will
27   give the Court correct facts."  (ECF No. 138 at 2.)  However, the court does not investigate claims
     or obtain evidence for parties.  Plaintiff was informed that he is required to provide specific facts
28   supported by evidence to rebut defendants' facts.  (ECF No. 107 at 2.)

1    of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered

2    Fed. R. Civ. P. 56(c)).  "Where the nonmoving party bears the burden of proof at trial, the moving

3    party need only prove that there is an absence of evidence to support the non-moving party's

4    case." Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.),

5    627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P.

6    56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have

7    the trial burden of production may rely on a showing that a party who does have the trial burden

8    cannot produce admissible evidence to carry its burden as to the fact").  Indeed, summary

9    judgment should be entered, after adequate time for discovery and upon motion, against a party

10   who fails to make a showing sufficient to establish the existence of an element essential to that

11   party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477

12   U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving

13   party's case necessarily renders all other facts immaterial." Id. at 323.

14           Consequently, if the moving party meets its initial responsibility, the burden then shifts to

15   the opposing party to establish that a genuine issue as to any material fact actually exists.  See

16   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

17   establish the existence of such a factual dispute, the opposing party may not rely upon the

18   allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

19   form of affidavits, and/or admissible discovery material in support of its contention that such a

20   dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

21   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

22   of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

23   (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

24   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

25   a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

26   (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d

27   1564, 1575 (9th Cir. 1990).

28   ////

6

1    In the endeavor to establish the existence of a factual dispute, the opposing party need not

2   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

3   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

4   trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

5   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

6   Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

7   amendments).

8    In resolving a summary judgment motion, the court examines the pleadings, depositions,

9   answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

10  Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

11  255.  All reasonable inferences that may be drawn from the facts placed before the court must be

12  drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences

13  are not drawn out of the air, and it is the opposing party's obligation to produce a factual

14  predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F.

15  Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

16  demonstrate a genuine issue, the opposing party "must do more than simply show that there is

17  some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could

18  not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

19  trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

20    By contemporaneous notice provided on January 23, 2015 (ECF No. 107 at 2-3), plaintiff

21  was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal

22  Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc);

23  Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

24  V.  Facts[5]

25    1.  On or about February 8, 2011, plaintiff was diagnosed with an abdominal hernia upon

26  ─────────────────────
27  [5]  For purposes of the pending motion, the following facts are found undisputed, unless otherwise
    indicated.  Documents submitted as exhibits are considered to the extent that they are relevant,
28  and despite the fact that they are not authenticated because such documents could be admissible at
    trial if authenticated.

his arrival at WSP, a reception center.  (ECF No. 32 at 3 (Am. Compl.).)

2.  On February 8, 2011, Dr. Zepp of WSP ordered a general surgical consultation concerning plaintiff's 3 cm reducible hernia.  (ECF No. 47 at 3.)

3.  Plaintiff arrived at HDSP on November 21, 2011, without the surgical consultation ordered by Dr. Zepp having taken place.  (ECF No. 32 at 4.)

4.  On January 10, 2012, PAC Miranda determined plaintiff was a high risk inmate because of his hypertension, history of myocardial infarction, total occlusion of the right coronary artery, and history of left iliac artery aneurysm, without mention of his abdominal hernia.  (ECF Nos. 32 at 12 (128-C3); 119 at 88 (same).)

5.  Because plaintiff was determined to be a high risk inmate, PAC Miranda prepared a CDCR 128-C3 Medical Classification Chrono, which also noted that plaintiff required medical care on an outpatient basis, needed infrequent basic consultations, uncomplicated nursing services, and had a functional capacity of "full duty."  (ECF No. 119 at 88.)

6.  On January 24, 2012, plaintiff's case came before an Institution Classification Committee ("ICC") at HDSP.  The hearing was held in plaintiff's absence at his request, and the ICC, chaired by Defendant Norgaard, elected to refer plaintiff's case to a Classification Staff Representative ("CSR") for consideration of a non-adverse transfer to either California State Prison-Los Angeles County, or Richard J. Donovan Correctional Facility.  (ECF Nos. 119 at 89; 107-3 at 61 (Norgaard Decl. at 2:7-16).)

7.  Under CDCR policies and procedures, the ICC makes a recommendation for transfer, but only the CSR has the authority to endorse inmates to any institution.  (ECF Nos. 32 at 7 (Third Level Appeal Decision); 107-3 at 2 (Lozano Decl. at 2:7-9); 107-3 at 5 (Smith Decl. at 1); 107-3 at 56 (Artis Decl. at 7-9); 107-3 at 61.)

8.  Under CDCR policies and procedures, inmates are classified and assigned to the institution of the appropriate security level and gender population nearest the prisoner's home, unless other classification factors make such a placement unreasonable, with the term "reasonable" including considerations of the safety of the prisoner and the institution, the length of the term, and the availability of institutional programs and housing.  (ECF No. 32 at 7-8 (Third

Level Review); 107-3 at 2; 107-3 at 6; 107-3 at 56; 107-3 at 61.)

9.   Under CDCR policies and procedures, the medical classification preferences can be overridden by a CSR by matching patient-inmate medical needs with facility capabilities at a particular institution.  (ECF Nos. 10 at 32 (Compl., Medical Classification Factor Priorities, § III(B)(2)); 107-3 at 6; 107-3 at 10 (Foulk Decl. at 2:10-13); 107-3 at 57; 107-3 at 61.)

10.   On February 8, 2012, defendant Smith, the CSR, determined that plaintiff was appropriately housed at HDSP because HDSP was a basic institution, with nursing and primary care provider services available on a continuous basis, urgent care available on site, a Correctional Treatment Center on site, and basic medical consultations available, so that the medical risk factor is not an absolute consideration for transfer.  CSR Smith also found that a transfer would not be financially prudent, and plaintiff had a tuberculosis code of 21, meaning that he had undergone a tuberculosis screening test which yielded a significant result and was considered "under diagnosis," and can be transported or moved only by special transportation using respiratory precautions.  (ECF Nos. 32 at 13; 107-3 at 6; 107-3 at 10; 107-3 at 14-15 (DOM, § 91080.7, pp. 796-97 (2012 ed.)); 107-3 at 18 (Medical R.)

11.   CSR Smith also noted that, under CDCR policies and procedures, the medical risk factor is not an absolute consideration for transfer because plaintiff was not being placed in a Minimum Support Facility, Camp, or out of state correctional facility, where medical resources may be limited.  (ECF Nos. 32 at 10; 107-3 at 6.)

12.   Based on the information contained in plaintiff's file, CSR Smith understood that plaintiff's medical issues were being adequately managed at HDSP, and that plaintiff did not require a transfer to another institution in order to obtain medical treatment on an emergency basis.  (ECF No. 107-3 at 7.)

13.   Plaintiff submitted a CDCR form 602 Inmate Parolee Appeal, Log No. HDSP-B-12-00618, requesting a "high risk medical transfer" in accord with the January 10, 2012 CDCR 128-C3 chrono.[6]  (ECF No. 32 at 15-18.)

---

[6]  The hernia is not mentioned in appeal log no. HDSP-B-12-00618. (ECF No. 32 at 15-17.)

9

14.  Defendant Norgaard interviewed plaintiff on March 28, 2012, in connection with the appeal log no. HDSP-B-12-00618, but did not make the decision to deny the appeal at the second level of review.  (ECF Nos. 32 at 10-11 (Second Level Response); 107-3 at 62.)  Defendant Norgaard understood that plaintiff's medical issues were being adequately managed at HDSP, and that plaintiff did not require a transfer to another institution in order to obtain medical treatment on an emergency basis.  (ECF No. 107-3 at 62.)

15.  On March 28, 2012, appeal log no. HDSP-B-12-00618 was denied at the second level of review because the medical risk factor is not an absolute consideration for transfer, but is only a preference, because plaintiff was not being placed in a Minimum Support Facility, Camp, or out of state correctional facility, where medical resources may be limited.  Such appeal was also denied because documentation in the appeal did not indicate that plaintiff's medical issues were not being adequately managed at HDSP on an out-patient basis, or that he required a transfer to another institution in order to obtain medical treatment on an emergency basis.  In addition, plaintiff is a mobility-impaired inmate, and HDSP is designated to house mobility-impaired inmates, as well as inmates designated as Outpatient Inmates with Infrequent Basic Consultation, Full Duty, and uncomplicated nursing, and because the Medical Classification System Procedures in effect provided:

> The Medical Classification Factors listed as preferences on Table I can be overridden by a CSR as part of matching overall patient-inmate medical needs with facility capabilities in a particular institution. If a CSR approves a placement using a Medical Classification Factor listed as a preference on Table 1, the CSR approval noted on the 128G must include the reason for using the flexibility provided by the Preference.

(ECF No. 32 at 10-11 (Second Level Response); ECF No. 10 at 32 (Compl., Medical Classification Factor Priorities, § III(B)(2)); 107-3 at 11.)

16.  Appeal log no. HDSP-B-12-00618 was denied at the third level of review by defendants Artis and Lozano, because defendants Artis and Lozano believed that HDSP was, in fact, able to accommodate plaintiff's medical needs, and that, under CDCR policies, a high medical risk is a preference which does not mandate inmate placement.  (ECF Nos. 32 at 7-8 (Third Level Review); 107-3 at 3; 107-3 at 57.)

17.  Medical staff at B-Yard at HDSP ignored plaintiff's abdominal hernia until Defendant Rohlfing took over B-yard.  (ECF No. 32 at 4:7-13.)

18.  On February 1, 2013, plaintiff completed a health services request form, stating that his abdominal hernia had shifted and become painful, and may have twisted.  (ECF No. 26 at 5.)  On February 2, 2013, plaintiff was seen by the triage nurse who noted that the protrusion in front was minimal, with no discoloration of skin, and that plaintiff described "reducing it on his own."  (Id.)

19.  On February 15, 2013, plaintiff was seen by PAC Miranda, who noted plaintiff's complaints as "increasing level of mid-abdominal umbilical hernia pain that is dull, does not radiate, intermittent, and 4/10 on pain scale.  He is concerned about hernia strangulation and wants a surgical evaluation."  (ECF No. 26 at 6.)  On February 15, 2013, PAC Miranda signed a Physician Request for Services seeking a routine outpatient consultation for surgical evaluation of plaintiff's "umbilical hernia that has become increasingly painful."  (ECF No. 119 at 99.)

20.  On March 3, 2013, plaintiff completed a health services request form stating that his abdominal hernia attempted to twist again today, and despite pain of 12 on scale of 10, plaintiff was able to work it back into position.  Plaintiff requested to see a surgeon as soon as possible.  (ECF No. 26 at 7.)

21.  Plaintiff was seen by Dr. Rohlfing on March 18, 2013.  (ECF Nos. 26 at 8; 119 at 19.)

22.  Dr. Syverson, of Susanville, California, an outside physician, provided the surgical consult for the hernia on March 18, 2013.  (ECF No. 119 at 99.)  Dr. Syverson was reluctant to perform the hernia repair in the Susanville area because he felt that there were inadequate resources there to address cardiac complications which may arise during surgery.  (ECF Nos. 32 at 4:15-23; 24 at 8:15-20 (Rohlfing Decl., Ex. B); 26 at 9 (Pl.'s Add.)

23.  Due to the concerns expressed by Dr. Syverson, plaintiff was endorsed for transfer to RJD on April 17, 2013.  (ECF Nos. 10 at 5, 34 (Compl.); 24 at 8:20-22.)

24.  Plaintiff was endorsed for transfer to RJD because RJD is the only CDCR Level III facility which can accommodate plaintiff's medical needs, custody level, and status as a Special Needs Yard inmate.  (ECF No. 24 at 4 (Amrein Decl. at 1:23-27).)

25.  Plaintiff did not require or obtain an updated CDCR 128-C3 Medical Classification Chrono in order to receive the transfer to RJD.  (ECF No. 107-3 at 31 (Pl.'s Dep. at 49:23-50:2).)

26.  Dr. Rohlfing did not have the authority to order a transfer of plaintiff.[7]  (ECF No. 107-3 at 37 (Pl.'s Dep. at 66:16-20).)

27.  On May 1, 2013, plaintiff filed an appeal log no. HDSP-B-13-01351, explaining that he received a surgical consult on March 18, 2013, for his abdominal hernia "which is extremely painful."  (ECF No. 119 at 128.)  Plaintiff added that Dr. Rohlfing followed-up on March 27, 2013, and

> we both agreed with Dr. Syverson about the need for a cardiology assessment, and a cardiology stand-by for any surgery. . ., and [plaintiff] should wait to see if the CSR does endorsement to RJD to allow [plaintiff] to obtain surgery at that institution, since it is needed and RJD is equipped to handle [plaintiff's] medical issues.

(ECF No. 119 at 128, 130.)

28.  On June 13, 2013, plaintiff filed a health care services request to see the doctor, noting his "abdominal hernia isn't getting any better."  (ECF No. 26 at 15.)  On June 21, 2013, plaintiff was examined by Dr. Rohlfing.  (ECF No. 26 at 16.)  Dr. Rohlfing noted plaintiff's abdominal hernia was awaiting transfer for surgery, and ordered ultrasound of plaintiff's iliac artery area.  (ECF No. 26 at 16, 18.)

29.  On July 6, 2013, plaintiff filed a request to see the doctor because his abdominal hernia pain was a 7 or 8 on 10 scale.  (ECF No. 26 at 19.)

30.  On July 8, 2013, the appeal was partially granted by Associate Warden Chapman, who noted that plaintiff was endorsed for transfer to RJD on April 17, 2013, but that HDSP had not been advised of an available bed at RJD, and that plaintiff was scheduled for a consultation with his heart doctor in mid-July, which would not prevent his transfer.  (ECF No. 119 at 132-33.)

31.  On July 14, 201[3], plaintiff sought second level review, stating that a "medical need should be a priority," and that his abdominal hernia "isn't getting any better."  (ECF No. 119 at

---

[7]  Plaintiff clarified in his deposition that Dr. Rohlfing "had the authority to put [plaintiff] back before classification to write a request for medical transfers . . . just like Miranda did."  (ECF No. 107-3 at 37).)

129.)  "Buses are arriving and leaving every day.  Priority medical should make a bus seat available immediately."  (Id.)

32.  On August 16, 2013, Chief Deputy Warden Peery partially granted plaintiff's appeal, again referring plaintiff's case to the CSR for an extension due to the upcoming expiration of his endorsement for transfer to RJD, but noting that although a bus seat may be available, RJD must have an available bed.  (ECF No. 119 at 134-35.)  Warden Peery noted that there are only three institutions that house level III SNY inmates that are designated medical high risk and such beds are difficult to obtain.  (ECF No. 119 at 135.)   Plaintiff's request for immediate transfer was denied, but efforts would continue to facilitate his transfer.  (Id.)

33.  On August 26, 2013, plaintiff sought third level review, noting he had been waiting for over 18 months for a high risk transfer, during which other prisoners who were high risk were transferred to RJD.  Plaintiff stated that his medical issues were "real and substantially fatal if worse happens."  (ECF No. 119 at 129.)

34.  On October 3, 2013, plaintiff's third level appeal was cancelled because plaintiff requested on appeal that he be endorsed by the CSR for transfer to RJD, and the CSR endorsed plaintiff for transfer on August 26, 2013.  (ECF No. 119 at 136.)  Thus, defendant Lozano found that plaintiff's issue had been resolved and further review was unnecessary.  (Id.)

35.  On October 13, 2013, plaintiff appealed the cancellation of appeal HDSP-B-13-01351, noting that the issue was not resolved because the CSR endorsement had expired and plaintiff had not been transferred.  (ECF No. 119 at 124.)  Plaintiff argued that a "surgical transfer should be a priority transfer."  (Id.)

36.  On December 18, 2013, the appeals examiner partially granted plaintiff's appeal, reversing the denial of plaintiff's third level appeal in appeal log no. HDSP-B-13-01351, and granting plaintiff 30 days in which to resubmit such appeal for third level review.  (ECF No. 119 at 148.)

37.  Plaintiff transferred to RJD on April 8, 2014.  (ECF No. 107-3 at 38 (Pl.'s Dep. at 81:17-19).)

////

38.  Plaintiff was not transferred to RJD prior to April 8, 2014, because of a lack of available space at RJD.  (ECF No. 24 at 5.)

39.  Between April 17, 2013, and April 8, 2014, plaintiff was on a waiting list for placement at RJD, along with other Level III Sensitive Needs Yard inmates with significant medical needs, and had priority over inmates with medical needs which were not as serious, but was lower on the waiting list than inmates with more serious medical needs.  (ECF No. 24 at 5.)

40.  While incarcerated at HDSP, plaintiff was diagnosed with a small umbilical hernia, which was not incarcerated or strangulated, and did not adversely affect any other body organs. (ECF No. 24 at 8.)

41.  While incarcerated at HDSP, Dr. Rohlfing believed that a surgical procedure to repair plaintiff's hernia was medically necessary, but should proceed on an elective basis, rather than on an emergency basis.  (ECF No. 24 at 8.)

42.  Dr. Rohlfing prescribed pain medication for plaintiff to manage the complaints of pain resulting from the umbilical hernia.  (ECF No. 24 at 8.)

43.  Dr. Rohlfing treated plaintiff's cardiac issues with medication and was aware that he was examined regularly by cardiologists, who did not recommend any further cardiac procedures.  (ECF No. 24 at 8.)

44.  Plaintiff has no complaints concerning the treatment of his cardiac issues at HDSP. (ECF No. 107-3 at 33) (Pl.'s Dep. at 52:1-16).)

46.  Dr. Rohlfing monitored plaintiff's left iliac artery aneurysm, conducting an ultrasound procedure which verified that the prior surgical by-pass was not breaking down or deteriorating, and that the aneurysm was not enlarging, and prescribing blood pressure medication which had a positive effect on the aneurysm, keeping it from enlarging.  (ECF No. 24 at 8-9.)

47.  Dr. Casian, a physician at RJD, filed a declaration in response to plaintiff's prior request for injunctive relief.  (ECF No. 88.)  Dr. Casian opined that because plaintiff was a "high risk" inmate, performing a hernia repair surgery meant that he could die on the operating table, so that hernia surgery should take place only when his risk is lower, or possibly postponed indefinitely in the absence of bona-fide symptoms which overtly interfere with daily activities.

14

(ECF No. 88 at 12 (Casian Decl. at 4:3-6).)

48.   The surgical evaluation from Dr. Syverson, dated March 13, 2013, considered the hernia repair as appropriate, with the condition that, because plaintiff was a high risk inmate, cardiac clearance would be obtained prior to any surgery.  (ECF Nos. 88 at 10; 107-3 at 19 (Medical R., Ex. E, at 3).)

49.   On July 14, 2014, plaintiff reported to Dr. Ghayouri that plaintiff was experiencing left inguinal area discomfort and swelling on and off for a few months, with symptoms worse on standing, and improved while lying down.  (ECF No. 94 at 18-19 (Reply).)

50.   On October 31, 2014, Dr. Casian opined that plaintiff's hernia had not posed any immediate risk to his health, did not appear to be causing him substantial pain, or was otherwise interfering with his activities of daily living.  (ECF No. 88 at 11.)

51.   When plaintiff met with Dr. Syverson on March 13, 2013, in order to discuss a surgical hernia repair, plaintiff had concerns regarding the risks associated with the procedure, including the risks posed by receiving anesthesia, because plaintiff had gone into shock during a prior surgical procedure.  (ECF No. 107-3 at 34 (Pl.'s Dep. at 57:17-58:8).)

52.   Dr. Syverson did not inform plaintiff that the hernia repair was an emergency or needed to be performed on an urgent basis.  (ECF No. 107-3 at 36 (Pl.'s Dep. at 60:5-16).)

53.   During his September 25, 2014 deposition, plaintiff was asked:

> if the surgeon were to tell you, that because of the fact you're going to be under anesthesia and your history of problems with anesthesia in the past and your heart issues, that there's a risk that you can die during the hernia procedure, based on what you know right now, are you still [going to] go through with the hernia procedure?

(ECF No. 107-3 at 39-40.)  Plaintiff responded:  "Well, I'll have to discuss with him.  I just don't know.  I'm more concerned about the screens they're gonna [sic] put in."  (ECF No. 107-3 at 40.)

54.   Dr. Swingle, a physician and Chief Medical Executive assigned to both HDSP and the California Correctional Center in Susanville, filed a declaration in response to plaintiff's prior request for injunctive relief.  (ECF No. 39 at 11-14; 119 at 104.)  Dr. Swingle reviewed plaintiff's medical records and noted that plaintiff's aneurysm was monitored through repeat ultrasound exams; a follow-up ultrasound was completed on July 3, 2013, ordered by Dr. Rohlfing; and a

1    repeat study, ordered by FNP Schmidt, was completed on January 16, 2014.  (ECF No. 39 at 12-

2    13.)  Dr. Swingle compared the result of these ultrasound studies with previous studies, and

3    opined that the study demonstrated no significant changes from the prior studies.  (ECF No. 39 at

4    13.)  Dr. Swingle confirmed that plaintiff's medical records indicate that FNP Schmidt discussed

5    these findings with plaintiff.  (Id.)  Moreover, Dr. Swingle found that FNP Schmidt did not refuse

6    to re-fill or discontinue plaintiff's prescriptions for pain medication or stool softeners.  (ECF Nos.

7    39 at 12 (Swingle Decl. at 13); 107-3 at 44.)[8]

8         55.  Plaintiff submitted a CDCR 602 HC Appeal, dated November 14, 2013, contending

9    that Dr. Rohlfing did not administer an ultrasound procedure correctly, and requesting that a

10   correct ultrasound or CT scan be administered.  (ECF No. 107-3 at 28-30 (Pl.'s Dep., Ex. G, at

11   40:1-42:1).)

12        56.  This Appeal, dated November 14, 2013, was not reviewed at the third level of

13   review.  (ECF No. 107-3 at 28 (Pl.'s Dep. at 40:1-42:1).)

14        57.  Plaintiff believes that he submitted CDCR 602 appeals at HDSP contending that he

15   had not received hernia surgery, but admits that none of these appeals were reviewed at the third

16   level of review.  (ECF No. 107-3 at 30 (Pl.'s Dep. at 42:12-25).)

17        58.  Plaintiff did not submit a CDCR 602 Appeal alleging that FNP Schmidt discontinued

18   plaintiff's medication or failed to perform any medical tests.  (ECF No. 107-3 at 26-27 (Pl.'s Dep.

19   at 38:15-39:8).)

20        59.  On May 16, 2014, plaintiff completed a Health Care Services Request Form at RJD,

21   asking to see a doctor.  (Pl.'s Dep., Ex. H.)  Plaintiff stated that he was transferred to RJD due to

22   his high risk medical issues, along with an abdominal hernia, and a large lump rising in the area

23   of left iliac artery aneurysm, and "[b]oth issues are becoming more painful, and bothersome."

24   (Id.)  Medical staff noted that plaintiff was seen by primary care physician Dr. Karan on April 17,

25   2014, and was scheduled for a follow-up appointment on June 2, 2014.  (Id.)

26

27   _____

[8]  Plaintiff appears to dispute Dr. Swingle's opinion of plaintiff's allegations concerning the
ultrasound and the medication issues in connection with defendants Dr. Rohlfing and FNP

28   Schmidt, but plaintiff presented no medical evidence to rebut Dr. Swingle's medical opinion.

60.  On December 10, 2014, plaintiff consulted with Dr. Justin King in San Diego.  (ECF No. 119 at 77.)  Plaintiff was previously seen by Dr. King by Telemedicine.  (Id.)  Dr. King noted that plaintiff "continue[d] to complain more so of pain and discomfort at the umbilical hernia but does admit to some discomfort in the left groin region."  (Id.)  Upon physical examination, Dr. King found plaintiff had an incarcerated umbilical hernia that was tender to palpation, with no overlying skin changes, and that plaintiff had a reducible left groin hernia.  (Id.)  Dr. King provided the following assessment and plan:

> Patient is a 68-year-old male with multiple medical comorbidities. A long discussion was held with the patient regarding his medical fitness to undergo any surgical intervention.  I discussed with the patient that he is a high risk for medical complications given his medical comorbidities.  Patient, however, stressed to me that he cannot continue to live with the discomfort at the umbilical hernia and would like to proceed with surgical intervention despite the increased potential risk.

> So, recommendation at this point, would be to proceed with umbilical hernia repair, possibly with mesh, and to not address the left groin hernia at this time as trying to address both hernias would increase operative time which would, at best, increase patient's possible complications related to his medical comorbidities.  Patient agrees to proceed with this plan.  Once patient is authorized, we will proceed with the umbilical hernia repair.

(ECF No. 119 at 77-78.)

## VI.  Alleged Failure to Exhaust

### A.  Legal Standards

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . , or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  Porter v. Nussle, 534 U.S. 516, 532 (2002).

Proper exhaustion of available remedies is mandatory, Booth v. Churner, 532 U.S. 731, 741 (2001), and "[p]roper exhaustion demands compliance with an agency's deadlines and other

1    critical procedural rules[.]"  Woodford v. Ngo, 548 U.S. 81, 90 (2006).  The Supreme Court has

2    also cautioned against reading futility or other exceptions into the statutory exhaustion

3    requirement.  See Booth, 532 U.S. at 741 n.6.  Moreover, because proper exhaustion is necessary,

4    a prisoner cannot satisfy the PLRA exhaustion requirement by filing an untimely or otherwise

5    procedurally defective administrative grievance or appeal.  See Woodford, 548 U.S. at 90-93.

6    "[T]o properly exhaust administrative remedies prisoners 'must complete the administrative

7    review process in accordance with the applicable procedural rules,' [] - rules that are defined not

8    by the PLRA, but by the prison grievance process itself."  Jones v. Bock, 549 U.S. 199, 218

9    (2007) (quoting Woodford, 548 U.S. at 88).  "The California prison system's requirements

10   'define the boundaries of proper exhaustion.'"  Marella v. Terhune, 568 F.3d 1024, 1027

11   (9th Cir. 2009)) (quoting Jones, 549 U.S. at 218).

12           In California, prisoners may appeal "any policy, decision, action, condition, or omission

13   by the department or its staff that the inmate or parolee can demonstrate as having a material

14   adverse effect upon his or her health, safety, or welfare."  Cal. Code Regs. tit. 15, § 3084.1(a).

15   On January 28, 2011, California prison regulations governing inmate grievances were revised.

16   Cal. Code Regs. tit. 15, § 3084.7.  Now inmates in California proceed through three levels of

17   appeal to exhaust the appeal process:  (1) formal written appeal on a CDC 602 inmate appeal

18   form, (2) second level appeal to the institution head or designee, and (3) third level appeal to the

19   Director of the California Department of Corrections and Rehabilitation ("CDCR").  Cal. Code

20   Regs. tit. 15, § 3084.7.  Under specific circumstances, the first level review may be bypassed.  Id.

21   The third level of review constitutes the decision of the Secretary of the CDCR and exhausts a

22   prisoner's administrative remedies.  See id. § 3084.7(d)(3).  Since 2008, medical appeals have

23   been processed at the third level by the Office of Third Level Appeals for the California

24   Correctional Health Care Services.  A California prisoner is required to submit an inmate appeal

25   at the appropriate level and proceed to the highest level of review available to him.  Butler v.

26   Adams, 397 F.3d 1181, 1183 (9th Cir. 2005); Bennett v. King, 293 F.3d 1096, 1098 (9th Cir.

27   2002).  Since the 2011 revision, in submitting a grievance, an inmate is required to "list all staff

28   members involved and shall describe their involvement in the issue."  Cal. Code Regs. tit. 15,

§ 3084.2(3).  Further, the inmate must "state all facts known and available to him/her regarding the issue being appealed at the time," and he or she must "describe the specific issue under appeal and the relief requested."  Cal. Code Regs. tit. 15, §§ 3084.2(a)(4).  An inmate now has thirty calendar days to submit his or her appeal from the occurrence of the event or decision being appealed, or "upon first having knowledge of the action or decision being appealed."  Cal. Code Regs. tit. 15, § 3084.8(b).

Failure to exhaust is "an affirmative defense the defendant must plead and prove."  Jones, 549 U.S. at 204, 216.  In Albino, the Ninth Circuit agreed with the underlying panel's decision[9] "that the burdens outlined in Hilao [v. Estate of Marcos, 103 F.3d 767, 778 n.5 (9th Cir. 1996),] should provide the template for the burdens here."  Albino v. Baca, 747 F.3d 1162, 1172 (9th Cir. 2014) (en banc).  A defendant need only show "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy."  Albino, 747 F.3d at 1172.  Once the defense meets its burden, the burden shifts to the plaintiff to show that the administrative remedies were unavailable.  See id.

A prisoner may be excused from complying with the PLRA's exhaustion requirement if he establishes that the existing administrative remedies were effectively unavailable to him.  See Albino, 747 F.3d at 1172-73.  When an inmate's administrative grievance is improperly rejected on procedural grounds, exhaustion may be excused as effectively unavailable.  Sapp v. Kimbrell, 623 F.3d 813, 823 (9th Cir. 2010); see also Nunez v. Duncan, 591 F.3d 1217, 1224-26 (9th Cir. 2010) (warden's mistake rendered prisoner's administrative remedies "effectively unavailable"); Brown v. Valoff, 422 F.3d 926, 940 (9th Cir. 2005) (plaintiff not required to proceed to third level where appeal granted at second level and no further relief was available).

Where a prison system's grievance procedures do not specify the requisite level of detail for inmate appeals, Sapp, 623 F.3d at 824, a grievance satisfies the administrative exhaustion requirement if it "alerts the prison to the nature of the wrong for which redress is sought."  Griffin

---

[9]  See Albino v. Baca, 697 F.3d 1023, 1031 (9th Cir. 2012).  The three judge panel noted that "[a] defendant's burden of establishing an inmate's failure to exhaust is very low."  Id. at 1031.  Relevant evidence includes statutes, regulations, and other official directives that explain the scope of the administrative review process.  Id. at 1032.

v. Arpaio, 557 F.3d 1117, 1120 (9th Cir. 2009).  "A grievance need not include legal terminology or legal theories unless they are in some way needed to provide notice of the harm being grieved. A grievance also need not contain every fact necessary to prove each element of an eventual legal claim.  The primary purpose of a grievance is to alert the prison to a problem and facilitate its resolution, not to lay groundwork for litigation."  Griffin, 557 F.3d at 1120.

Prisoners may raise new claims against the same defendants in an amended complaint, provided that the grievance process concerning such claims is completed prior to the filing of the amended complaint.  Rhodes, 621 F.3d at 1006.

If under the Rule 56 summary judgment standard, the court concludes that plaintiff has failed to exhaust administrative remedies, the proper remedy is dismissal without prejudice. Wyatt v. Terhune, 315 F.3d 1108, 1120, overruled on other grounds by Albino, 747 F.3d 1162.

B.  Discussion

Defendants contend that plaintiff failed to exhaust his administrative remedies as to his claims against defendants FNP Schmidt and Dr. Rohlfing prior to filing his amended complaint on January 6, 2014.  Plaintiff concedes that he failed to exhaust administrative remedies, but asks the court to excuse such failure.

1.  Defendant FNP Schmidt

Plaintiff contends that defendant FNP Schmidt discontinued plaintiff's medication (ECF No. 119 at 27), "countermanded" Dr. Rohlfing's November 26, 2013 order for prescriptions, and cancelled the aneurysm ultrasound ordered by Dr. Rohlfing on November 26, 2013 (ECF No. 119 at 20).  Defendants argue that plaintiff did not submit an appeal contending that FNP Schmidt improperly cancelled medication.  Rather, plaintiff submitted two appeals, log nos. HDSP HC 13027764 and HDSP HC 14027827, each requesting a refill of his medication without alleging that FNP Schmidt cancelled the prescription.  Defendants contend that neither appeal was pursued through the third level of review.

The record reflects that appeal log no. HDSP HC 13027764 does not name Schmidt, and also does not allege that plaintiff's medication was improperly cancelled; rather, plaintiff sought a refill of fiber tab prescription, and alleged a delay in receiving his refills.  (ECF No. 119 at 137-

38.)  The appeal response notes that plaintiff's prescription had expired and needed to be reordered by plaintiff's provider.  (ECF No. 119 at 137.)  Appeal log no. HDSP HC 14027827 also sought a refill of the stool softener medication.  (Id. at 139.)  The appeal response notes that plaintiff sought a refill too soon.  (Id. at 139.)  Neither of these appeals address the ultrasound issue.  Because these appeals do not name FNP Schmidt and do not allege that prison staff wrongfully cancelled plaintiff's fibertab medication, or address plaintiff's claim concerning the ultrasound, such appeals would not have exhausted the instant claims against FNP Schmidt.

Moreover, even if the court construed the appeals as including plaintiff's medication claims against FNP Schmidt, plaintiff failed to obtain a third level review of either appeal.  It is well-established that a plaintiff must properly exhaust by using all steps of the administrative process and complying with "deadlines and other critical procedure rules."  Woodford, 548 U.S. at 90.  In his deposition, plaintiff admitted that the only third level decisions he received were the ones he attached to his complaint (ECF No. 107-3 at 27), which he confirmed in his supplemental opposition (ECF No. 134 at 1).  Appeal log no. HDSP-B-13-01351 did not include plaintiff's allegations that FNP Schmidt discontinued plaintiff's medication or failed to perform any medical tests because it was signed by plaintiff on May 1, 2013, before the instant allegations took place.  Appeal log no. HDSP-B-12-00618 addressed the denial of his request for high risk medical transfer by CSR Smith in 2012, which also pre-dates the instant allegations, and plaintiff does not allege FNP Schmidt was involved in the denial of the 2012 transfer.  Plaintiff points to no other administrative appeals that would have exhausted the instant claims against FNP Schmidt.

In addition, plaintiff's amended complaint was signed on January 1, 2014, and filed on January 6, 2014.  Plaintiff's allegations against FNP Schmidt concerning medication and the ultrasound took place after November 26, 2013.  (ECF No. 32 at 5.)  Thus, as argued by defendants, there was insufficient time for plaintiff to have obtained a third level review of such allegations prior to the filing of the amended complaint.

Accordingly, absent evidence demonstrating that existing administrative remedies were effectively unavailable, FNP Schmidt is entitled to summary judgment on plaintiff's claims concerning medication and the ultrasound based on plaintiff's failure to exhaust his

21

1    administrative remedies prior to filing the amended complaint.

2             2.  Defendant Dr. Rohlfing

3             Plaintiff filed two appeals in which Dr. Rohlfing is named or mentioned.

4             First, in appeal log no. HDSP-B-13-01351, signed on May 1, 2013, plaintiff noted that he

5    underwent a surgical consult for his "extremely painful" abdominal hernia on March 18, 2013,

6    and on March 27, 2013, Dr. Rohlfing did a follow up about a surgical consultation.  (ECF No.

7    119 at 129-30.)  Plaintiff confirmed that both he and Dr. Rohlfing agreed with Dr. Syverson about

8    plaintiff's need for a cardiology assessment, and a cardiology stand-by for any surgery, and that

9    plaintiff should wait to see if the CSR endorsed him for transfer to RJD, since RJD is equipped to

10   handle his medical issues.  (ECF No. 119 at 130.)  The CSR endorsed plaintiff for transfer to RJD

11   on April 17, 2013, and plaintiff wrote:  "Surgery is required and needed, why am I still here?"

12   (ECF No. 119 at 128.)  In the July 14, 2012 request for second level review, plaintiff argued that a

13   medical need should be a priority, and noted that his abdominal hernia wasn't getting any better,

14   and that the outside surgeon confirmed surgery was required.  (ECF No. 119 at 129.)  In his

15   August 26, 2013 request for third level review, plaintiff stated that he had been waiting for over

16   18 months for a high risk transfer.  (ECF No. 119 at 129.)

17            Nowhere in appeal log no. HDSP-B-13-01351 did plaintiff allege that Dr. Rohlfing acted

18   improperly, failed to authorize hernia surgery, or failed to ensure that plaintiff was timely

19   transferred to RJD.  Plaintiff identified no other administrative appeal in which plaintiff claimed

20   that he was being denied hernia repair surgery.

21            As set forth above, in order to exhaust administrative remedies, plaintiff must list all staff

22   members involved and describe their involvement in the issue.  Cal. Code Regs. tit. 15,

23   § 3084.2(a)(3).  In the amended complaint, plaintiff alleges that Dr. Rohlfing did nothing to

24   facilitate plaintiff's transfer, refusing to write another chrono at plaintiff's subsequent

25   classification hearings because PAC Miranda had written a chrono in 2012.  However, plaintiff

26   did not include such allegations in appeal log no. HDSP-B-13-01351.  Moreover, appeal log no.

27   HDSP-B-13-01351 did not include factual allegations that would put prison officials on notice

28   that plaintiff claimed Dr. Rohlfing acted improperly or otherwise denied or delayed plaintiff's

1    hernia repair surgery.  Rather, plaintiff claimed that he and Dr. Rohlfing had agreed with Dr.

2    Syverson's findings.  Thus, appeal log no. HDSP-B-13-01351 does not serve to exhaust

3    plaintiff's claims against Dr. Rohlfing.

4          Second, plaintiff submitted a CDCR 602 HC Appeal, dated November 14, 2013,

5    contending that Dr. Rohlfing did not administer an ultrasound procedure correctly, and requesting

6    that a correct ultrasound or CT scan be administered.  (ECF No. 107-3 at 28-30 (Pl.'s Dep., Ex.

7    G, at 40:1-42:1).)  However, it is undisputed that plaintiff failed to appeal this claim to the Third

8    Level of Review.  (ECF No. 107-3 at 28 (Pl.'s Dep. at 40:1-42:1).)  Because plaintiff failed to

9    receive a third level review of his November 14, 2013 appeal, such appeal does not serve to

10   exhaust plaintiff's claim concerning the ultrasound ordered by Dr. Rohlfing.

11         Thus, absent evidence showing that the existing administrative remedies were effectively

12   unavailable, Dr. Rohlfing is entitled to summary judgment.

13         3.  Request to be Excused from Exhaustion Requirement

14         As set forth above, a prisoner may be excused from complying with the PLRA's

15   exhaustion requirement if he establishes that the existing administrative remedies were effectively

16   unavailable to him.  See Albino, 747 F.3d at 1172-73.  When an inmate's administrative

17   grievance is improperly rejected on procedural grounds, exhaustion may be excused as effectively

18   unavailable.  Sapp, 623 F.3d at 823; see also Nunez, 591 F.3d at 1224-26 (administrative

19   remedies were "effectively unavailable" due to warden's mistake); Brown, 422 F.3d at 940

20   (where appeal granted at second level and no further relief was available, prisoner not required to

21   appeal to third level).  However, "for an inmate to claim that a prison's grievance procedure was

22   effectively unavailable due to the inmate's unawareness of the procedure, the inmate must show

23   that the procedure was not known and unknowable with reasonable effort."  Albino v. Baca, 697

24   F.3d 1023, 1037 (9th Cir. 2012).  In other words, an inmate is obligated "to make reasonable,

25   good-faith efforts to discover the appropriate procedure for complaining about prison conditions

26   before unawareness may possibly make a procedure unavailable."  Id. at 1035.

27         Plaintiff's argument that he was unaware of the revised exhaustion requirements because

28   no revisions were posted or provided to him are rebutted by the evidence demonstrating that he

was transferred to HDSP on November 21, 2011, after the January 28, 2011 revisions went into effect.  Thus, the revised exhaustion requirements were already set forth in Title 15, copies of which were provided in various locations at HDSP.  (ECF No. 136 at 8.)  Because the revisions predated plaintiff's transfer to HDSP, the actions of prison staff did not render the administrative remedies unavailable to plaintiff by failing to provide him with any revisions.

Plaintiff appears to dispute Amrein's position that copies of the regulations were available to plaintiff in his housing unit at HDSP.  However, plaintiff does not refute that copies of the regulations were available in the program office or in the law library.  In addition, although plaintiff contends that he was not provided with a copy of title 15, he does not declare that he asked for a copy and was denied.  Rather, he asks that defendants provide evidence that plaintiff signed for a copy of title 15.  (ECF No. 138 at 2.)  This is insufficient because plaintiff "has the burden to show that the grievance procedure was unavailable based on his unawareness of the grievance procedure."  Albino, 697 F.3d at 1035.  Plaintiff sets forth no efforts he undertook to obtain title 15 and identifies no reasonable efforts he took to find out the requirements for administrative exhaustion.  Thus, plaintiff failed to meet his burden by demonstrating that the prison's grievance procedure was effectively unavailable to him.  Indeed, plaintiff successfully pursued at least three appeals through the third level of review, which suggests plaintiff was aware of the requirements.  (Appeal log nos. HDSP-B-13-01351, HDSP-B-12-00618, and HDSP-13-00349 (classification challenge) (ECF No. 19 at 10).)

Also, plaintiff appears to argue that appeal log no. HDSP-B-13-01351 was improperly rejected, and that the rejection notice No. 13-02717 and the reversal notice No. 1304747, were only issued in an attempt to delay his appeal.  Plaintiff claims that Sapp, 623 F.3d at 823, provides that "exhaustion may be excused as effectively unavailable."  (ECF No. 134 at 3.)  However, as detailed above, appeal log no. HDSP-B-13-01351 did not include the instant allegations as to Dr. Rohlfing; thus, even if the court found such appeal was improperly rejected, it would not have served to exhaust the claims raised in the amended complaint as to Dr. Rohlfing.  Similarly, the appeal of the cancellation of the third level review in Log No. 1302717, and the subsequent reversal notice 1304747 (ECF No. 134 at 16-20), did not name Dr. Rohlfing

1  or contain plaintiff's specific allegations against the doctor, and does not appear improperly

2  rejected.  Rather, plaintiff's appeal of the cancellation was granted, and plaintiff was granted

3  thirty days in which to submit another third level appeal in appeal log no. HDSP-B-13-01351.

4  (ECF No. 119 at 148.)  Thus, plaintiff's reliance on Sapp is unavailing.  Id, 623 F.3d at 824.

5  Finally, defendants are correct that plaintiff is not allowed to raise new claims in an

6  opposition or reply brief.  Wasco Prods., Inc. v. Southwall Techs., Inc., 435 F.3d 989, 991 (9th

7  Cir. 2006) ("Simply put, summary judgment is not a procedural second chance to flesh out

8  inadequate pleadings.")  Because plaintiff's new claim that Dr. Rohlfing and FNP Schmidt

9  allegedly failed to comply with DOM procedures was not included in the amended complaint, the

10  court declines to consider it.[10]

11  Therefore, plaintiff has failed to establish that existing administrative remedies were

12  effectively unavailable, and defendants are entitled to dismissal of these claims.  While this is a

13  harsh result, Congress makes clear that prisoners are required to exhaust administrative remedies

14  prior to filing actions in federal court.  Defendants Schmidt and Dr. Rohlfing should be granted

15  summary judgment, and plaintiff's claims against them should be dismissed without prejudice.

16  VII.  Eighth Amendment Claims

17  Plaintiff alleges that defendants Norgaard, Smith, Artis, Lozano, and Foulk[11] (hereafter

18  "remaining defendants") were deliberately indifferent to plaintiff's serious medical needs by

19  refusing to follow doctor's orders.  (ECF No. 32 at 3.)

20  ////

21  ////

22

23  [10]  In any event, such claims are unexhausted, and would not excuse plaintiff's failure to exhaust
the instant claims against defendants FNP Schmidt and Dr. Rohlfing.  The failure of state prison
24  officials to follow state prison regulations does not rise to the level of a constitutional violation.
See Weilburg v. Shapiro, 488 F.3d 1202, 1207 (9th Cir. 2007) Galen v. City of Los Angeles, 468
25  F.3d 563, 572 (9th Cir. 2006); Sweaney v. Ada County, Idaho, 119 F.3d 1385, 1391 (9th Cir.
1997).  Thus, granting plaintiff leave to amend to pursue this new claim would be futile.
26

27  [11]  Because plaintiff failed to exhaust his administrative remedies as to Dr. Rohlfing and FNP
Schmidt, the undersigned does not address the merits of plaintiff's Eighth Amendment claims
28  against them.

A. <u>Legal Standards</u>

"[D]eliberate indifference to serious medical needs of prisoners constitutes the

unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment.  This is true

whether the indifference is manifested by prison doctors in their response to the prisoner's needs

or by prison guards in intentionally denying or delaying access to medical care or intentionally

interfering with the treatment once prescribed."  <u>Estelle v. Gamble</u>, 429 U.S. 97, 104-05 (1976)

(internal citations, punctuation and quotation marks omitted).  Plaintiff must show (1) a "serious

medical need" by demonstrating that failure to treat the condition could result in further

significant injury or the unnecessary and wanton infliction of pain, and (2) that the defendant's

response was deliberately indifferent.  <u>Jett v. Penner</u>, 439 F.3d 1091, 1096 (9th Cir. 2006).

(citations omitted).

A medical need is serious "if the failure to treat a prisoner's condition could result in

further significant injury or the 'unnecessary and wanton infliction of pain.'"  <u>McGuckin v.</u>

<u>Smith</u>, 974 F.2d 1050, 1059 (9th Cir. 1991), <u>overruled on other grounds by</u> <u>WMX Techs., Inc. v.</u>

<u>Miller</u>, 104 F.3d 1133 (9th Cir. 1997), quoting <u>Estelle</u>, 429 U.S. at 104.

If a prisoner establishes the existence of a serious medical need, he must then show that

prison officials responded to the serious medical need with deliberate indifference.  <u>See</u> <u>Farmer v.</u>

<u>Brennan</u>, 511 U.S. 825, 834 (1994).  In general, deliberate indifference may be shown when

prison officials deny, delay, or intentionally interfere with medical treatment, or may be shown by

the way in which prison officials provide medical care.  <u>Jett</u>, 439 F.3d at 1096 (citation omitted).

To act with deliberate indifference, a prison official must both be aware of facts from which the

inference could be drawn that a substantial risk of serious harm exists, and he must also draw the

inference.  <u>Farmer</u>, 511 U.S. at 837.  Thus, a defendant is liable if he knows that plaintiff faces "a

substantial risk of serious harm and disregards that risk by failing to take reasonable measures to

abate it."  <u>Id.</u> at 847.  "[I]t is enough that the official acted or failed to act despite his knowledge

of a substantial risk of serious harm."  <u>Id.</u> at 842.

Moreover, before it can be said that a prisoner's civil rights have been violated, "the

indifference to his medical needs must be substantial.  Mere 'indifference,' 'negligence,' or

1    'medical malpractice' will not support this cause of action." Broughton v. Cutter Laboratories,

2    622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105-06). See also Toguchi v.

3    Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere negligence in diagnosing or treating a

4    medical condition, without more, does not violate a prisoner's Eighth Amendment rights.").

5    Deliberate indifference is "a state of mind more blameworthy than negligence" and "requires

6    'more than ordinary lack of due care for the prisoner's interests or safety.'" Farmer, 511 U.S. at

7    835.

8         Delays in providing medical care may manifest deliberate indifference. Estelle, 429 U.S.

9    at 104-05. To establish a claim of deliberate indifference arising from delay in providing care, a

10   plaintiff must show that the delay was harmful. See Hallett v. Morgan, 296 F.3d 732, 745-46 (9th

11   Cir. 2002) (delays without significant harm do not constitute an Eighth Amendment violation);

12   Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985) (mere delay

13   of surgery is insufficient absent evidence the denial was harmful). In this regard, "[a] prisoner

14   need not show his harm was substantial; however, such would provide additional support for the

15   inmate's claim that the defendant was deliberately indifferent to his needs." Jett, 439 F.3d at

16   1096.

17        Finally, mere differences of opinion as to the proper course of treatment for a medical

18   condition between a prisoner and prison medical staff do not give rise to a § 1983 claim. See

19   Toguchi, 391 F.3d at 1058; Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).

20        B. Discussion

21        The parties do not dispute that plaintiff's umbilical hernia constitutes a serious medical

22   need. A painful condition necessitating surgical intervention will almost certainly rise to the level

23   of an objectively serious medical need. See, e.g., McGuckin, 974 F.2d at 1059-62 (objectively

24   serious medical need existed where prisoner endured a more than 3 1/2 year delay in receiving

25   back surgery for "dramatic" condition "constituting massive herniation" of inmate's back and

26   upper torso, which caused inmate extreme, increasing pain that was successfully treated by the

27   surgery). Thus, the analysis focuses on the subjective element -- whether the remaining

28   defendants were deliberately indifferent to plaintiff's serious medical needs by denying plaintiff's

1    high risk medical transfer, or by delaying or interfering with prescribed medical treatment in

2    connection with plaintiff's abdominal hernia.

3        First, in his opposition, plaintiff claims the remaining defendants failed to comply with

4    Dr. Zepp's order that plaintiff receive a surgical consult for his hernia.  However, these remaining

5    defendants are nonmedical staff.  Plaintiff must demonstrate that each defendant was deliberately

6    indifferent; that is, each defendant "must both be aware of the facts from which the inference

7    could be drawn that a substantial risk of serious harm exists, and he must also draw the

8    inference."  Farmer, 511 U.S. at 837.  Here, plaintiff adduced no evidence demonstrating that the

9    remaining defendants had knowledge of Dr. Zepp's order, issued at WSP in 2011 before plaintiff

10   was transferred to HDSP.  Plaintiff adduced no evidence demonstrating that he made these

11   remaining defendants aware of Dr. Zepp's order, or that these remaining defendants were

12   responsible for setting up the surgical consult, or ensuring that the surgical consult took place.

13       Second, contrary to plaintiff's assertion (ECF No. 119 at 21), PAC Miranda's January 10,

14   2012 medical classification chrono ("chrono") did not state that he was "no longer appropriately

15   housed at HDSP," or that he "requires a transfer to accommodate his medical needs."  (ECF Nos.

16   32 at 12; 119 at 88.)  Rather, the chrono classified plaintiff as a high risk inmate based on

17   plaintiff's hypertension, history of myocardial infarction, total occlusion of his right coronary

18   artery, and history of left iliac artery aneurysm.  (Id.)  Indeed, there is no mention of a

19   recommended transfer, or of plaintiff's hernia, in PAC Miranda's chrono.  (Id.)  Moreover,

20   although the chrono categorizes plaintiff as "high risk," there is nothing on the chrono that

21   indicates plaintiff could not safely remain at HDSP; rather, PAC Miranda noted that plaintiff

22   required outpatient care, infrequent basic consultations, and uncomplicated nursing.  (Id.)  PAC

23   Miranda did not mark the "tertiary consultations" intensity of services (ECF No. 32 at 12), which

24   is defined as "Close to tertiary care hospitals, services and specialists: . . . invasive cardiologists,

25   subspeciality surgeons."[12]  (ECF No. 132 at 7.)  Plaintiff provided no other CDCR 128-C3 chrono

---

[12]  The 128-C3 form (10/09) is two pages.  The second page was not in plaintiff's health record.
(ECF No. 132 at 1.)  However, the exemplar second page of the form, also dated 10/09, contains
definitions of the categories listed on page one.  (ECF No. 132 at 7.)  There are no blank lines or
circles on page two that require completion.  (Id.)

1   authored by PAC Miranda that includes the language plaintiff claims it does.[13]  (ECF No. 119 at

2   21.)  "A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is

3   insufficient to create a genuine issue of material fact."  Nilsson v. City of Mesa, 503 F.3d 947,

4   952 n.2 (9th Cir. 2010) (citation omitted).  Here, the chrono provided by plaintiff (ECF No. 119 at

5   88) does not include the verbiage plaintiff claims it does.

6          In his March 13, 2012 administrative appeal challenging the denial of his medical transfer,

7   plaintiff states that PAC Miranda

8               clearly explained to [plaintiff] that with [his] health issues,
            [Miranda] was filing a 128-C3 request for medical transfer, and that
9           [plaintiff] would be near a hospital "not 2 hrs away from the
            nearest" hospital if the weather permits, because should [plaintiff]
10          have a heart attack, the substantial risk would be fatal.

11  (ECF No. 32 at 15, 17.)  However, despite this writing, plaintiff did not provide a declaration

12  from PAC Miranda confirming the substance of their conversation or a medical record in which

13  PAC Miranda noted such conversation.

14         Plaintiff provides no evidence from PAC Miranda or another medical expert opining that

15  plaintiff could not be safely housed at HDSP due to the health concerns listed on PAC Miranda's

16  2012 chrono.  Plaintiff claims that his hernia should be included because his hernia was an

17  obvious health issue.  However, plaintiff provides no evidence demonstrating that the hernia

18  presented a serious health risk in 2012 when the chrono was authored.  Indeed, plaintiff appears

19  to concede that his hernia was not protruding very much or causing extreme pain in 2012.  (ECF

20  No. 32 at 4.)

21         Because plaintiff's claim that PAC Miranda ordered a medical transfer is contradicted by

22  PAC Miranda's own 2012 chrono, and the chrono does not include an order for a medical

23  transfer, defendants Norgaard, Smith, Artis, Lozano and Foulk cannot be deliberately indifferent

24  to plaintiff's safety needs by allegedly ignoring or interfering with such an order.

---

25  [13] It appears that plaintiff may believe that PAC Miranda issued two different 128-C3 chronos.
    (ECF No. 119 at 23) ("A medical classification chrono *was also issued* because of the plaintiff's
26  hypertension, history of myocardial infarction. . . .")  But plaintiff fails to support such suggestion
    with evidence.  None of the 128-C3 chronos provided by plaintiff state that plaintiff is no longer
27  appropriately housed at HDSP and requires a transfer to accommodate his medical needs.  (ECF
    Nos. 32 at 12; 119 at 88, 127 (2013 form).)
28

Third, at the January 24, 2012 program review, which was held without plaintiff at his request, the ICC noted that plaintiff could only be accommodated at three prisons: RJD, LAC and MCSP IV SNY, and elected to refer plaintiff to the CSR for a non-adverse transfer to LAC IV SNY, with an alternate of RJD IV SNY. (ECF No. 32 at 9.) There is no mention of plaintiff's hernia in this committee report. (Id.) Plaintiff submitted no evidence demonstrating that he put the ICC on notice that his hernia was not being repaired, or that his hernia could not be repaired while he was housed at HDSP. Because the hearing was held in his absence, plaintiff did not verbally inform the ICC about his hernia. Thus, the remaining nonmedical defendants could not be deliberately indifferent to plaintiff's need for hernia repair based on the January 24, 2012 program review.

Fourth, in his opposition, plaintiff now appears to claim that he should have been transferred out of HDSP because his high risk status placed him at grave risk because Reno is four hours away. (ECF No. 119 at 23.) Plaintiff claims that HDSP was starting to transfer all high risk inmates to the Reno Medical Center, and that "other inmates classified as high risk, cardiac, stress cases had to be shipped out to areas where such medical care could be administered." (Id.) Plaintiff contends that the medical care offered at HDSP was minimal aftercare, such as caring for inmates following off-site surgery. But as set forth above, there was no order from PAC Miranda requiring plaintiff's transfer. Moreover, plaintiff fails to support with evidence his allegations concerning the care available to him at HDSP. It is undisputed that plaintiff is not challenging the health care he received at HDSP for his cardiovascular issues. As Dr. Rohlfing declared in response to plaintiff's motion for injunctive relief, despite plaintiff's history of cardiac issues, plaintiff's "conditions have been treated with the insertion of stents and currently are controlled through the use of medication, including statins and nitroglycerin." (ECF No. 24 at 8.) Dr. Swingle concurred in this evaluation. (ECF No. 119 at 105.) In addition, while housed at HDSP, plaintiff was regularly examined by cardiologists not employed by CDCR; plaintiff was seen by one such physician on July 30, 2013, and the cardiologist recommended no further cardiac procedures, and recommended plaintiff receive a follow-up examination in six months. (Id.) Plaintiff adduced no medical evidence demonstrating that he was not provided

1   appropriate care at HDSP for the health issues addressed by Miranda's 2012 chrono.

2        Fifth, while it was subsequently learned, through Dr. Syverson's 2013 surgical consult,

3   that plaintiff could not undergo hernia repair surgery at HDSP because such surgery would

4   require standby cardiac services, such information was not available to the remaining defendants

5   in 2012.  Thus, the remaining defendants cannot be held liable for failing to transfer plaintiff

6   pursuant to the 2012 chrono so he could obtain hernia surgery.  The administrative appeals filed

7   by plaintiff did not mention the hernia, and he adduced no evidence demonstrating that any of the

8   remaining defendants, all of whom are nonmedical staff, were aware that plaintiff needed hernia

9   surgery.  Defendants Norgaard and Smith reviewed plaintiff's central file (ECF No. 107-3 at 6,

10   61), but there is no evidence that any of the remaining defendants reviewed plaintiff's medical

11   file.  Although defendant Norgaard interviewed plaintiff in connection with his appeal, defendant

12   Norgaard did not deny plaintiff's appeal.  The denial by CSR Smith was based on prison

13   regulations that stated that plaintiff's transfer was not required because he was not being housed

14   in a facility with fewer medical services than a "basic" institution as HDSP, which could provide

15   plaintiff appropriate medical care.  (ECF Nos. 32 at 13; 107-3 at 6.)  CSR Smith's decision is

16   supported by Dr. Rohlfing's confirmation that plaintiff's cardiac needs were being met at HDSP,

17   and Dr. Swingle's medical opinion that plaintiff's cardiovascular needs were being met at HDSP.

18   The subsequent denials of plaintiff's administrative appeals by defendants Foulk, Artis, and

19   Lozano were also based on the prison regulation supporting plaintiff's housing.  Again, plaintiff

20   adduced no evidence demonstrating that he could not receive adequate medical care for his

21   cardiovascular needs while housed at HDSP.  But even if the remaining defendants had reviewed

22   plaintiff's medical file and saw that Dr. Zepp had ordered a surgical consult for plaintiff's hernia

23   in 2011, plaintiff provided no 2011 or 2012 medical order stating that plaintiff required hernia

24   repair surgery or needed to be transferred in order to receive hernia repair surgery.  Moreover,

25   plaintiff received a surgical consult from Dr. Syverson while housed at HDSP, so plaintiff did not

26   need to be transferred to a different prison to obtain the surgical consult initially ordered by Dr.

27   Zepp.

28   ////

1    Sixth, plaintiff appears to contend that the remaining defendants are liable because their

2    beliefs that HDSP was able to accommodate plaintiff's medical needs are "refuted by the facts of

3    this case retrospectively" because plaintiff was "not able to obtain any substantive-medical care at

4    HDSP." (ECF No. 119 at 6.)  However, negligence is insufficient to demonstrate an Eighth

5    Amendment violation.  Rather, plaintiff must demonstrate that each defendant knew, yet

6    disregarded, an excessive risk to plaintiff's health or safety; the defendant must both be aware of

7    the facts from which an inference could be drawn, and must have also drawn the inference.

8    Farmer, 511 U.S. at 837.  The evidence demonstrates that plaintiff could and did receive adequate

9    medical care for his cardiovascular needs at HDSP.  Plaintiff provided no evidence that in 2012

10   the remaining defendants were aware of plaintiff's need for hernia repair surgery, or that the

11   hernia could not be repaired at HDSP.  The remaining defendants cannot be held accountable for

12   facts not known to them in 2012.  Even if the remaining defendants had reviewed plaintiff's

13   medical file, Dr. Zepp's 2011 request for a general surgical consult for plaintiff's 3 cm umbilical

14   hernia would not have put these nonmedical prison staff on notice that the hernia posed an

15   excessive risk to plaintiff's health or safety, or that a surgical evaluation would necessarily result

16   in a recommendation that surgery be performed.

17   Seventh, plaintiff now contends that nonmedical staff were not allowed to thwart his high

18   risk medical transfer on financial grounds.  CSR Smith's CDC 128-G states that "A transfer at

19   this time is not financially prudent & [plaintiff] has a TB code of 21." (ECF No. 32 at 13.)  In his

20   declaration, defendant Smith explained that because plaintiff had a tuberculosis code of 21, he

21   could be transported or moved only by special transportation using respiratory precautions.  (ECF

22   No. 107-3 at 6.)  In plaintiff's declaration, he states that he previously came into contact with an

23   outbreak of TB, and as a precautionary measure, took medicine for six months.  (ECF No. 119 at

24   29.)  Plaintiff avers that he now has a "false-positive" reaction to TB testing, but that the CDCR

25   does not require plaintiff to submit to mandatory testing.  (Id.)

26   Initially, the court notes that plaintiff did not include this claim in his amended complaint.

27   Moreover, CSR Smith was not a medical staff person, and there is no evidence that CSR Smith

28   reviewed plaintiff's medical file or was aware that plaintiff registered a false positive on his TB

test.  Absent evidence demonstrating that CSR Smith was aware that plaintiff registered a false positive on his TB test or that the TB code of 21 was in error, a reasonable juror could not find that CSR Smith was deliberately indifferent by taking financial considerations into account, particularly where the evidence shows that plaintiff's cardiovascular needs were being met at HDSP.  Again, absent a medical order stating that plaintiff must be transferred due to his high risk status, defendant Smith could not have interfered with an order that did not exist.

Finally, even assuming, *arguendo*, that PAC Miranda's 2012 chrono could be construed as an order directing plaintiff's medical transfer based on his high risk cardiovascular needs, plaintiff concedes he received the cardiovascular care he required at HDSP and sustained no damages therefrom.  Absent evidence that CSR Smith was aware that plaintiff required hernia surgery that could not be performed at HDSP, no rational juror could find that CSR Smith was deliberately indifferent to plaintiff's serious medical needs by failing to transfer plaintiff based on his need for hernia repair surgery.  Here, the evidence demonstrates that plaintiff did not receive a medical decision stating that plaintiff required cardiac standby in order to have his hernia repaired until Dr. Syverson issued his report on March 18, 2013.  Thus, Dr. Syverson's report issued after defendant CSR Smith issued the CDC 128-G on February 8, 2012, and after defendant Norgaard interviewed plaintiff in connection with his appeal in 2012, and after defendants Artis, Lozano, and Foulk addressed plaintiff's appeals in 2012.  Moreover, the record reflects that plaintiff received medical care, including pain medications, for his hernia during this period.  Thus, such remaining defendants could not have been deliberately indifferent to plaintiff's health or safety based on their actions, or failure to act, in 2012.

Therefore, for all of the above reasons, the undersigned finds that plaintiff failed to raise a genuine dispute of material fact as to whether the remaining defendants acted with deliberate indifference.  See Toguchi, 391 F.3d at 1057-58, 1060 (deliberate indifference is a high legal standard, and is met only if each defendant knows of and disregards an excessive risk to the inmate's health).  The remaining defendants are also entitled to summary judgment.

////

////

1

C.  38 Month Delay

2

Plaintiff alleges that he suffered a 38 month delay in obtaining hernia repair surgery.

3

Plaintiff states that "if the defendants did not know about such dangerous conditions subjected

4

upon plaintiff, their lack of knowledge inherent to making plaintiff wait 38-months was then due

5

to their negligence."  (ECF No. 119 at 14.)  Plaintiff has demonstrated that his hernia posed a

6

serious medical need, meeting the first prong of Farmer.  The second prong, deliberate

7

indifference, can be established "by showing (a) a purposeful act or failure to respond to a

8

prisoner's pain or possible medical need and (b) harm caused by the indifference.  Jett, 439 F.3d

9

at 1096.

10

It is undisputed that medical staff at HDSP ignored plaintiff's umbilical hernia from

11

November 21, 2011, until Dr. Rohlfing took over medical care at Yard B.  However, during this

12

period, plaintiff adduced no evidence that he presented to medical with complaints of extreme

13

pain or requested surgery.  Rather, the record reflects that plaintiff presented with a painful hernia

14

on February 1, 2013, and on February 15, 2013, told PAC Miranda that his hernia pain was

15

increasing and requested a surgical consult.  (ECF No. 26 at 5-6.)  That very day PAC Miranda

16

wrote a request for routine surgical consult for the hernia.  (ECF No. 119 at 99.)  Thus, while

17

plaintiff was not provided with the surgical consult ordered by Dr. Zepp on February 8, 2011,

18

plaintiff failed to adduce evidence demonstrating that the delay between February 8, 2011, and

19

February 15, 2013, was the result of deliberate indifference rather than mere negligence.  The fact

20

that PAC Miranda marked the surgical consult as "routine" raises an inference that plaintiff's

21

hernia did not require urgent surgical intervention and apparently had not deteriorated during the

22

period of delay.  This inference is further supported by Dr. Syverson's subsequent consult, which

23

did not state that plaintiff urgently required hernia repair; rather, hernia surgery was conditional to

24

cardiac clearance due to plaintiff's high risk medical status.  (ECF No. 119 at 99.)

25

As for the delay between February 15, 2013, and the date plaintiff finally received hernia

26

repair surgery at RJD, the record reflects that various factors contributed to the delay.  First,

27

plaintiff's classification made it difficult to find bed space at an appropriate prison.  Plaintiff was

28

required to be housed at a level III prison in a special needs yard, and is designated medical high

34

1   risk.  Such beds are difficult to obtain.  Proper housing is a legitimate safety and security concern

2   for custody staff, and absent a medical order stating that plaintiff's hernia posed an urgent need

3   for surgery, plaintiff adduced no evidence demonstrating that such delay by custody staff

4   constituted deliberate indifference.

5          Second, the surgery was delayed due to plaintiff's other health issues.  Plaintiff's

6   cardiovascular issues took precedence over his small umbilical hernia.  Dr. Swingle opined that

7   plaintiff was receiving appropriate medical care at HDSP, including prescriptions and stool

8   softeners, and that while surgical repair of the hernia is medically appropriate, the surgery should

9   "proceed on an elective basis rather than on an urgent basis."  (ECF No. 39 at 12.)  Dr. Casian

10   found that prison doctors were conservatively treating plaintiff in light of his high risk medical

11   status, and that "[a]ny plans for hernia surgery were conditional, and subject to necessary

12   evaluation of his cardiovascular fitness before undertaking surgery."  (ECF No. 88 at 11.)  Indeed,

13   even after plaintiff received cardiac clearance, it appears that Dr. King was reluctant to perform

14   the hernia repair:  "A long discussion was held with the patient regarding his medical fitness to

15   undergo any surgical intervention," noting plaintiff "is a[t] high risk for medical complications

16   given his medical comorbidities."  (ECF No. 119 at 77.)  Dr. King declined to address both of

17   plaintiff's hernias because it would "increase operative time" and "possible complications."  (Id.)

18   Thus, the record reflects that the delay in plaintiff's hernia repair surgery was based on medical

19   judgment.  Capri v. Cox, 2014 WL 5529355 (D. Nev. Oct. 31 2014) (no deliberate indifference as

20   to prisoner's five year need for hernia repair where evidence showed prisoner first required aortic

21   valve replacement ("AVR") surgery); Woods v. Ameji, 2011 WL 673990, at *11 (C.D. Ill.

22   Feb.16, 2011) (treatment of prisoner's hernia with conservative, non-surgical treatment was

23   "grounded in their professional judgment" and therefore did not amount to deliberate

24   indifference); see also Webb v. Hamidullah, 281 F. App'x. 159, 167 (4th Cir. June 6, 2008) (no

25   liability where medical personnel, when informed by inmate of his hernia-related pain, "did not

26   ignore his complaints," but instead monitored his condition and provided pain medication); Cox

27   v. Jackson, 579 F.Supp.2d 831, 855 (E.D. Mich. 2008) (no deliberate indifference where inmate

28   "was seen for his hernia on several occasions and prescribed treatment or restrictions," instead of

1   surgical repair as inmate argued was required).[14]  Here, plaintiff clearly disputes this medical

2   prioritization, and argues the hernia repair should have been performed earlier.  However, absent

3   medical evidence to the contrary, such dispute demonstrates a difference of opinion, not

4   deliberate indifference.  Sanchez, 891 F.2d at 242.

5           Third, plaintiff's ambivalence also partially contributed to the delay.  In his May 1, 2013

6   appeal, plaintiff agreed that he needed a cardiology assessment before any surgery.  (ECF No.

7   119 at 128, 130.)  In his April 16, 2014 status report, plaintiff stated that due to his age, heart and

8   other health issues, as well as the delay in receiving the surgery, and because there have been

9   recent fatalities caused by infections resulting from screens used in hernia repair surgeries at RJD,

10  plaintiff "may have to live with the pain from [his] abdominal hernia" rather than elect to have

11  hernia repair surgery.  (ECF No. 40 at 2.)  At his deposition, plaintiff again expressed concern

12  about the screens that would be used to repair the hernia.  (ECF No. 107-3 at 39-40.)

13          Finally, plaintiff failed to demonstrate that he suffered harm as a result of the delay.

14  Plaintiff claims he "was left in pain periodically and not given the proper medical treatment [to]

15  which he was entitled."  (ECF No. 119 at 13.)  He claims that the hernia repair surgery "became a

16  botched and failed procedure and they have to do it all over again.  After swelling and healing

17  process, the surgeon will assess."  (ECF No. 119 at 14.)  Plaintiff also provided Dr. King's report

18  which noted that plaintiff's hernia was incarcerated and tender to palpation on exam.  (ECF No.

19  119 at 77.)

20          Plaintiff's statements are insufficient to demonstrate that he suffered harm from the delay.

21  While Dr. King's report notes that the hernia was incarcerated on December 10, 2014, plaintiff

22  adduced no evidence refuting Dr. Rohlfing's declaration that the hernia was not incarcerated at

23  HDSP, or the evidence reflecting that plaintiff was able to personally reduce the hernia, at least

24

25  [14]  "Indeed, other courts have declined to find deliberate indifference where prison medical
    providers have exercised similar professional judgment in denying surgical repair."  Hamby v.

26  Hammond, 2015 WL 1263253 (W.D. Wash. March 19, 2015), citing see, e.g., Anderson v. Bales,
    2013 WL 1278122, at *1 (7th Cir.2013); Rodriguez v. Secretary Pennsylvania Dept. of

27  Corrections, 441 F. App'x. 919, 923 (3rd Aug. 12, 2011) (surgery provided only after diagnosis
    of incarcerated strangulated umbilical hernia); Woods, 2011 WL 673990, at *11 (surgery not

28  provided for non-enstrangulated, non-emergent, reducible hernia).

on two occasions, while housed at HDSP.  (ECF No. 26 at 5, 7.)  Plaintiff's claim of intermittent pain is insufficient to demonstrate significant harm.  The record reflects that plaintiff was provided stool softeners to avoid constipation which would aggravate his umbilical hernia, as well as pain medications to treat the hernia pain.  Plaintiff provided no medical evidence supporting his claim that the hernia repair was a "botched and failed surgery," or even assuming the surgery was a failure, that the failure was caused by the delay in having the surgery.  Thus, plaintiff adduced no evidence that the delay led to further injury.  Shapley, 766 F.2d at 407 (where prisoner alleges delay in medical treatment constitutes deliberate indifference, prisoner must show delay led to further injury).

For all of these reasons, plaintiff failed to demonstrate that the delay in receiving hernia surgery constituted an excessive risk of harm to his health, particularly in light of his competing high risk medical conditions.

D. Qualified Immunity

Because the undersigned finds that all defendants are entitled to summary judgment, the issue of qualified immunity need not be addressed.

VIII.  Leave to Amend

The undersigned is sympathetic to plaintiff's frustration in the delays he suffered in obtaining hernia repair surgery.  As noted by plaintiff, despite Dr. Zepp's February 8, 2011 order for a general surgical consult, plaintiff did not receive a surgical consult until March 18, 2013, and ultimately did not receive hernia repair surgery until after December of 2014.  Although hernia repair is an elective procedure absent complications not present here, a patient who chooses to have his hernia repaired should not have to wait over three years to obtain such elective surgery.  Accordingly, the court considers whether plaintiff should be granted leave to file a second amended complaint.

As noted above, it appears undisputed that medical staff at B-Yard at HDSP ignored plaintiff's abdominal hernia from November 2, 2011, the date he arrived at HDSP, until Dr. Rohlfing took over B Yard.  In his unverified amended complaint, plaintiff states:

////

1
2
3
4

> Each and every time plaintiff would bring up his hernia issue, medical staff in B-Yard clinic would just ignore the hernia problem since it was not protruding out very much or causing extreme pain at that moment. This being during [sic] L. Schmidt was attending doctor for B-Yard Clinic 2012 [sic], until Dr. Rohlfing took over for B-Yard.

5  (ECF No. 32 at 4.) Plaintiff states he had constant hernia pain when he saw Dr. Rohlfing. (Id.)

6      Plaintiff did not identify the "medical staff" who allegedly ignored plaintiff's hernia

7  problem from 2011 until Dr. Rohlfing took over, or submit evidence concerning the lack of hernia

8  care during this period.[15] The first evidence concerning plaintiff's pain from the hernia is from

9  February of 2013. (ECF No. 26 at 5, 6.) Thus, it is unclear whether plaintiff suffered extreme or

10  increased pain during this initial period, or whether plaintiff's discomfort with the hernia did not

11  present as "constant pain" until after Dr. Rohlfing took over plaintiff's care. Because plaintiff

12  provided no evidence for this time frame, the court cannot determine whether plaintiff could

13  demonstrate medical staff were deliberately indifferent, or whether this initial delay was mere

14  negligence. Inadequate medical care does not constitute cruel and unusual punishment

15  cognizable under § 1983 unless the mistreatment rose to the level of "deliberate indifference to

16  serious medical needs." Estelle, 429 U.S. at 106.

17      However, given plaintiff's concession at his deposition that he did not exhaust, to the third

18  level of review, administrative appeals about the lack of hernia surgery (ECF No. 107-3 at 30), it

19  appears that granting leave to amend to include allegations concerning medical care from 2011

20  through 2012 would be futile.

21      Once plaintiff saw Dr. Syverson on March 13, 2013, it was determined that plaintiff's

22  hernia surgery was conditional, and other legitimate reasons contributed to the further delay of the

23

24

25

26

27

28

---

[15] Plaintiff's statement that defendant L. Schmidt was attending doctor for B Yard Clinic in 2012, standing alone, is insufficient to demonstrate that FNP Schmidt ignored plaintiff's hernia, or was responsible for ensuring plaintiff received the surgical consult as ordered by Dr. Zepp. Plaintiff's verified opposition only addresses FNP Schmidt's alleged actions in November of 2013 pertaining to medications and an ultrasound. (ECF No. 119 at 20.) Moreover, such claim is unexhausted because plaintiff concedes that FNP Schmidt's name was not mentioned in any appeal filed by plaintiff concerning his high risk medical concerns (ECF No. 134 at 1) and that appeals about the lack of hernia surgery were not exhausted through the third level of review (ECF No. 107-3 at 30).

1  hernia repair surgery, as set forth above.  But the record reflects that plaintiff continued to receive

2  medical treatment, including pain medications for his hernia.  On October 31, 2014, Dr. Casian

3  opined that plaintiff's hernia had not posed any immediate risk to his health, did not appear to be

4  causing him substantial pain, or was otherwise interfering with his activities of daily living.  (ECF

5  No. 88 at 11.)  Therefore, the undersigned finds it would also be futile to grant plaintiff leave to

6  amend to pursue claims related to the delay from March 2013 through the 2014 surgery.

7        For all of the above reasons, the undersigned declines to recommend that plaintiff be

8  granted leave to file a second amended complaint.

9  IX.  Conclusion

10       In accordance with the above, IT IS HEREBY RECOMMENDED that defendants'

11  motion for summary judgment (ECF No. 107) be granted.

12       These findings and recommendations are submitted to the United States District Judge

13  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

14  after being served with these findings and recommendations, any party may file written

15  objections with the court and serve a copy on all parties.  Such a document should be captioned

16  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

17  objections shall be filed and served within fourteen days after service of the objections.  The

18  parties are advised that failure to file objections within the specified time may waive the right to

19  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

20  Dated:  October 9, 2015

21

22                                                   KENDALL J. NEWMAN
                                                     UNITED STATES MAGISTRATE JUDGE

23  /ceci1923.msj

24

25

26

27

28

39